[No. S004757. Crim. No. 26150. Nov. 1, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
THEODORE FRANCIS FRANK, Defendant and Appellant.

## COUNSEL

Fern M. Laetham, State Public Defender, under appointment by the Court of Appeal, Stephen Matchett and Kent Barkhurst, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Harley D. Mayfield, Assistant Attorney General, Janelle B. Davis, Leslie B. Fleming and Jeffrey K. Koch, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

LUCAS, C. J.—Defendant Theodore Francis Frank appeals from a judgment imposing the death penalty following his conviction of first degree murder with special circumstances and other offenses. In *People* v. *Frank* (1985) 38 Cal.3d 711 [214 Cal.Rptr. 801, 700 P.2d 415] (*Frank I*), we reversed defendant's original judgment as to penalty, finding prejudicial error in the seizure and admission of his notebooks, which contained incriminating statements. We affirmed the judgment in all other respects, and denied a habeas corpus petition. On retrial of penalty, pursuant to the 1977 death penalty law under which defendant was originally tried, the jury again returned a death verdict, and the trial court denied defendant's motion to modify the sentence (Pen. Code, § 190.4, subd. (e); all further statutory references are to this code unless otherwise indicated). Defendant's appeal is automatic. (§ 1239, subd. (b).) Subsequent to the filing of this appeal, defendant filed a second habeas corpus petition which we denied without issuing an order to show cause.

## I. FACTS

With the exception of the notebook evidence and certain jail inmate testimony not presented on retrial, the prosecution's case-in-chief at the

retrial revealed the same basic facts that were disclosed at the initial trial and were summarized in *Frank I.* We review them briefly.

## A. *The Present Offenses*

Defendant was convicted of kidnapping, molesting, raping and murdering a two-year-old girl, Amy S., in March 1978. As indicated above, that conviction has become final and is not challenged here. The evidence supported a finding that defendant kidnapped the child from her aunt's house or yard, bound her hands and feet, struck her head with a powerful blow or blows, raped her, inserted dirt or similar material into her vagina and anus, pinched and tore her breasts and nipples with vise-grip pliers, and thereafter strangled and killed her. Defendant left Amy's nude body by a stream, where it was discovered a few days later.

## B. *The Other Offenses*

The People introduced evidence of several other offenses (adjudicated and unadjudicated) by defendant involving crimes of violence against children, committed both prior and subsequent to the present offenses. Because this case requires an assessment of the prejudicial nature of various trial court errors or omissions, we describe these offenses in some detail.

1. *Linda G.*—In July 1978, defendant lured eight-year-old Linda G. into his car, drove her to an isolated area, forced her to consume four cans of beer, removed her pants, inserted a metal object and a pen into her rectum, placed his fingers into her vagina, orally copulated her and forced her to orally copulate him, pinched her breasts, and tried to stuff her panties down her throat. Subsequently, defendant drove Linda to a gas station, took her inside a men's room and urinated on her. Defendant eventually released her after forcing her to accompany him to a stream, where he poured water over her head.

2. *Melinda R.*—In June 1978, defendant kidnapped six-year-old Melinda R., pulled her into his car, ordered her to undress, fondled her vagina and inserted his finger into it, and eventually released her.

3. *Lashonda B.*—In August 1974; defendant grabbed four-year-old Lashonda B., pulled her into his car, drove to an isolated field, removed her clothes, forced her to orally copulate him, raped her, and eventually released her.

4. *Rynetta C.*—In May 1973, defendant grabbed four-year-old Rynetta C., pulled her into his car, tied her hands, drove to an isolated area near a

stream, gave her something to drink, removed her clothes, scraped her stomach with a knife which he inserted into her vagina, causing bleeding, inserted some pliers in her vagina, placed her in the stream, and departed.

5. *Brian J.*—In November 1972, defendant *apparently* (see part II.D., *post*) lured eight-year-old Brian J. into his car, drove to an isolated area, ordered Brian to undress, beat him when he refused to do so, removed Brian's clothes and orally copulated him, tried to force Brian to reciprocate, poured lighter fluid or ether on a rag and rubbed it onto Brian's face, and eventually released Brian after he bit one of defendant's fingers.

6. *Dawn F.*—In May 1968, defendant approached 11-year-old Dawn F., who was looking for her bicycle, and told her he knew where to find it. Defendant led Dawn into a house under construction, hit her over the head with a board, and began tearing off her clothes. Defendant released her after she began screaming loudly.

### C. *The Defense Evidence*

In addition to some "lingering doubt" evidence offered to dispute defendant's guilt of Amy's murder, defendant presented both expert and lay evidence regarding his character. Dr. Rosenthal, a psychiatrist, testified that defendant was a pedophile driven by a strong impulsive need to release sexual tension with children. According to Dr. Rosenthal, defendant's need to gratify his impulses was beyond his control and constituted a mental illness. Dr. Nuernberger, a staff psychiatrist at San Quentin Prison, confirmed defendant's "impulse disorder," opining that his molestations were not voluntary or intentional.

Various witnesses attested to defendant's exemplary prison record, his positive influence on others, his religious activities, his "strong talent" for art, his "warmth" and positive attitude, and his lack of disciplinary infractions, escape attempts or gang affiliations.

### II. CONTENTIONS

### A. *Inadequacy of Foundational Hearing Regarding Defendant's Prior Offenses*

Prior to trial, the People notified defendant of the proposed evidence to be offered in aggravation of penalty. (See former § 190.3.) Defendant thereupon moved for a "preliminary hearing" regarding all of his prior unadjudicated criminal offenses, to assure that the evidence was sufficient to justify jury consideration thereof. The court acknowledged that it had discretion to

"control the proceedings," including the power to determine the relevance and admissibility of evidence prior to its admission. The court offered defendant a foundational hearing held pursuant to Evidence Code section 402 to examine any witnesses/victims whom defense counsel was unable to interview prior to trial.

Such a foundational hearing was held as to witnesses Gerald B. and Lanita Y. Defendant now contends that, despite the hearing, the jury was exposed to prejudicial evidence regarding these two witnesses. (Although defendant phrases the issue in broader terms, challenging the court's failure to order a preliminary hearing regarding *each* of defendant's supposed offenses, that question is not properly before us in light of the hearing that was provided here.)

1. *Gerald B.*—In his opening statement, the prosecutor informed the jury of defendant's various prior offenses, including a 1973 offense against seven-year-old Gerald B. According to the prosecutor, defendant kidnapped the boy, punched him in the face several times, removed his clothes, tied him up and buried him naked in the snow, where defendant left him.

Before Gerald was called to testify, however, the court held a foundational hearing and ultimately ruled his testimony inadmissible on various grounds. Following presentation of the People's case, the court instructed the jury to disregard the prosecutor's opening remarks about the Gerald B. incident.

2. *Lanita Y.*—In his opening statement, the prosecutor likewise referred to defendant's 1968 asserted molestation of 11-year-old Lanita Y. After a foundational hearing was held, Lanita was permitted to testify that defendant walked into her home while her parents were absent, carried her into a bedroom, removed her bathing suit and rubbed her vagina. According to Lanita, defendant asked her to fondle his penis, which she refused, and he inserted his finger into her vagina. Lanita also testified that after 20 years, she remains emotionally disturbed about the assault.

Following the presentation of the People's case, the court ruled that Lanita's identification of defendant was legally insufficient. Her testimony was ordered stricken and the judge, in a lengthy admonition, told the jury not to consider it for any purpose.

As the court stated to the jury, "You are not to consider for any purpose any reference to Lanita Y[.] and any reference to Gerald B[]. In other words, there is no evidence before you concerning [them]. Those are not issues for your consideration. [¶] Do you understand what I just explained,

ladies and gentlemen? Do you think you can follow the court's instruction? That is, just disregard references to those two names. Can you all do that? [¶] I'm satisfied that the jury has thought about it and has agreed to follow the court's instructions in that regard."

3. *Discussion*—According to defendant, if the court had conducted an adequate and timely preliminary hearing regarding defendant's various offenses, the inadmissibility of the Gerald B. and Lanita Y. incidents would have become apparent before the jury had learned of them. Defendant cites *People* v. *Phillips* (1985) 41 Cal.3d 29, 72, footnote 25 [222 Cal.Rptr. 127, 711 P.2d 423], in which we acknowledged that "in many cases it may be advisable for the trial court to conduct a preliminary inquiry *before the penalty phase* to determine whether there is substantial evidence to prove each element of the other criminal activity." (Italics added.)

■ As *Phillips* (*supra*, 41 Cal.3d 29) suggests, the preferred time for a foundational hearing as to potentially prejudicial "other crimes" evidence would be *before* the penalty trial, including the prosecutor's opening statement, commences. Even unsubstantiated prosecutorial remarks can, under certain circumstances, unduly prejudice the defendant. Had Gerald B.'s proposed testimony been ruled inadmissible prior to trial, the jury would not have been exposed to the prosecutor's description of the incident. Nonetheless, the prosecutor's account of Gerald's ordeal was not unduly inflammatory, involving no direct sexual molestation, and the court admonished the jury to disregard the evidence. Accordingly it is not reasonably possible the jury's verdict was affected by the account, given the plethora of properly admitted aggravating evidence summarized above.

As for the incident involving Lanita Y., despite the foundational hearing the court failed to rule her testimony inadmissible until she had completed testifying. Unlike the Gerald B. incident, the Lanita Y. episode included sexual molestations. But the molestations and other misconduct were relatively minor compared to those described by most of the other child victims. In light of the court's lengthy admonition to the jury to disregard the evidence, and its largely cumulative nature, we do not find it reasonably possible the jury's verdict was affected by Lanita's testimony or the prosecutor's reference to the incident in his opening statement.

Defendant believes it "unrealistic" to assume the jury was able to follow the court's admonition and completely disregard the statements and evidence regarding the two incidents. He cites cases indicating that under certain circumstances, an admonition is insufficient to cure the effect of unduly prejudicial evidence. (E.g., *Bruton* v. *United States* (1968) 391 U.S. 123, 135-136 [20 L.Ed.2d 476, 484-485, 88 S.Ct. 1620] [codefendant's

confession implicating defendant]; *People* v. *Guerrero* (1976) 16 Cal.3d 719, 730 [129 Cal.Rptr. 166, 548 P.2d 366] [inadmissible prior brutal sex crimes against 17-year-old girl].)

We find these cases distinguishable, involving evidence far more likely to unduly prejudice the defendant than the evidence at issue here. As the People observe, the general rule is that on appeal we must assume the jury followed the court's instructions and admonitions. (E.g., *People* v. *Chavez* (1958) 50 Cal.2d 778, 790 [329 P.2d 907]; *People* v. *Beach* (1983) 147 Cal.App.3d 612, 624-625 [195 Cal.Rptr. 381].) In light of the relatively minor molestations involved in these two incidents, and their largely cumulative nature, we conclude that any error in admitting evidence or argument regarding them was not prejudicial.

## B. *Inadmissibility of Other Offenses Subject to Plea Bargain*

■ Defendant next contends that some of the evidence of his other molestations and assaults was inadmissible because the charges were dismissed pursuant to plea bargains. Thus, the Arizona charges against defendant relating to Dawn F. were dismissed on condition he plead guilty to a Missouri offense. An oral copulation charge involving Lashonda B. was dismissed as part of a bargain whereby defendant pleaded guilty to a felony child molestation offense. Similar bargaining reduced the charges against defendant as to victims Linda G. and Melinda R.

Defendant asserts that plea bargains are "constitutional contracts" subject to due process principles of fundamental fairness. (See *People* v. *Mancheno* (1982) 32 Cal.3d 855, 860 [187 Cal.Rptr. 441, 654 P.2d 211].) He points to the general rule that implicit in such bargains is the understanding that the defendant "will suffer no adverse sentencing consequences by reason of the facts underlying, and solely pertaining to, the dismissed count." (*People* v. *Harvey* (1979) 25 Cal.3d 754, 758 [159 Cal.Rptr. 696, 602 P.2d 396].) Defendant also urges that double jeopardy principles bar use of any offenses that were "transactionally related" to offenses dismissed pursuant to plea bargains.

In *People* v. *Melton* (1988) 44 Cal.3d 713, 755 [244 Cal.Rptr. 867, 750 P.2d 741], we determined that *Harvey*'s (*supra*, 25 Cal.3d 754) general rule was inapplicable to capital sentencing. As we stated in *Melton*, "Nothing in *Harvey* implies that it would be 'improper and unfair' for a capital sentencing jury to consider the circumstances of prior dismissed or bargained charges when deciding whether death is the appropriate penalty for a *subsequent* capital offense . . . . [S]ection 190.3 prohibits evidence of other 'violent criminal activity' by the defendant only if he was 'prosecuted *and*

*acquitted.*' A bargained conviction or dismissal is not an 'acquittal' as described in section 190.3." (Italics in original, fn. omitted.)

*Melton* likewise rejected the claim that double jeopardy principles are implicated "when the details of misconduct which has already resulted in conviction and punishment, *or in dismissal pursuant to a plea bargain* or for witness unavailability, are presented in a later proceeding on the separate issue of the appropriate penalty for a *subsequent* offense. [Citation.]" (44 Cal.3d at p. 756, fn. 17, italics added.)

We conclude that the challenged evidence was admissible despite the bargained for dismissals.

### C. *Inadmissibility of Prior "Remote" Unadjudicated Offenses*

 Defendant observes that one of the "other crimes" offered by the People as an aggravating circumstance was the 1973 kidnap/assault on Rynetta C., an offense that evidently resulted in no formal criminal charges. Defendant contends that the admission of evidence on unadjudicated offenses, especially one so remote as to be time-barred, violated his confrontation and due process rights under the state and federal Constitutions. He makes similar remoteness claims regarding the 1968 assault on Dawn F. and the 1972 assault on Brian J.

We have frequently rejected similar arguments. (See, e.g., *People* v. *Robertson* (1989) 48 Cal.3d 18, 42-43 [255 Cal.Rptr. 631, 767 P.2d 1109]; *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480].) Defendant offers us no sound basis for reconsidering those holdings. Although the trial courts generally possess discretion to exclude evidence pertaining to remote offenses (see Evid. Code, § 352; *People* v. *Thomas* (1978) 20 Cal.3d 457, 466-467 [143 Cal.Rptr. 215, 573 P.2d 433]), under section 190.3 the courts lack discretion to exclude the fact of the prior offense entirely. (*People* v. *Douglas* (1990) 50 Cal.3d 468, 531 [268 Cal.Rptr. 126, 788 P.2d 640]; *People* v. *Karis* (1988) 46 Cal.3d 612, 641 [250 Cal.Rptr. 659, 758 P.2d 1189].)

In any event, we find no abuse of discretion here. The murder of Amy occurred *in 1978.* A continuing pattern of prior assaults and molestations of children commencing in 1968 was certainly relevant to the penalty determination and, from that standpoint, the offenses in 1968, 1972, and 1973 cannot be deemed unduly remote.

Defendant complains that although the trial court instructed the jury on the necessity of finding each prior offense proved beyond a reasonable

doubt, the court failed to require jury *unanimity* on such offenses before it could consider them as aggravating evidence. We have rejected this argument (*People* v. *Miranda* (1987) 44 Cal.3d 57, 99 [241 Cal.Rptr. 594, 744 P.2d 1127]; see *People* v. *Ghent* (1987) 43 Cal.3d 739, 774-775 [239 Cal.Rptr. 82, 739 P.2d 1250]), and we decline to reconsider those decisions here. In addition, the record indicates that defense counsel expressly declined a unanimity instruction, in order to avoid "highlighting" the nature of the other crimes.

Finally, defendant asserts the court erred in allowing the prosecutor to "relitigate the facts and circumstances of [defendant's] prior convictions and dismissals," by eliciting the victims' testimony regarding the various offenses. Again, we have rejected similar arguments on several occasions. (See *People* v. *Robertson, supra,* 48 Cal.3d at pp. 46-47; *People* v. *McLain* (1988) 46 Cal.3d 97, 110 [249 Cal.Rptr. 630, 757 P.2d 569]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301].) As stated in *Gates,* "When dealing with violent conduct it is not the *fact* of conviction which is probative in the penalty phase, but rather the *conduct* of the defendant which gave rise to the offense." (43 Cal.3d at p. 1203, italics in original.)

### D. *Asserted Error in Admitting Evidence of Brian J. Incident*

As indicated previously, one of the "other crimes" sought to be proved by the prosecution involved the molestation and assault on Brian J. At the foundational hearing held prior to trial, Brian testified concerning the incident, including the fact that he had identified his assailant at a police lineup. Brian was not asked, however, whether defendant was the man he identified.

Thereafter, at trial, the prosecutor elicited substantially the same information from Brian, again without eliciting whether defendant was the man he identified. The prosecutor did ask Brian to describe the lineup identification procedure, and showed Brian a photograph of a lineup displaying five adults each bearing numbers from one to five. Brian testified without equivocation that "number three" was his assailant. Although he was not asked whether the third man in the photograph was the defendant, a previous witness, Peggy Douderman, had positively identified defendant as the person depicted as number three in that same photograph (which was admitted into evidence).

■ Defendant now contends that Brian failed properly to identify defendant as the person who molested him. He observes that both the foundational hearing and the trial testimony were insufficient in this regard. He

further notes that, according to the record, the photograph from which Brian identified his assailant was a photograph of a lineup *different* from the one viewed by Brian. (The photo actually depicted the lineup assembled for the Rynetta C. incident; defendant was a participant in both lineups.)

We agree with the People's response that witness Douderman's positive identification of defendant furnished the missing link in Brian's testimony, regardless which lineup the photograph in question was really depicting. In essence, Brian selected a man in a photograph as his assailant, and Ms. Douderman confirmed that the man depicted therein was in fact defendant.

Moreover, any uncertainty in the matter was attributable to defendant's failure to object, or move to strike, once it became apparent that the People did not tie him more closely to the incident. A motion to strike, accompanied by an appropriate admonition or instruction, would have minimized any damage arising from Brian's testimony. As the People note, we have stated that failure to object to evidence offered following a foundational hearing "normally constitutes a waiver." (*People* v. *Karis, supra*, 46 Cal.3d at pp. 634-635, fn. 16.) We also have indicated that no waiver occurs where the foundational hearing and trial occur, as here, contemporaneously (*ibid.*). Yet, in the present case, defendant failed to raise the faulty identification point at any time prior to appeal, either at the foundational hearing or at trial.

In any event, we reasonably may adopt the People's ultimate position that, regardless of any error in admitting the evidence, no prejudice to defendant resulted therefrom, because the properly admitted "other crimes" evidence was equally aggravating, involving assaults and molestations of several young girls. Seen in that light, Brian's testimony was largely cumulative. We reject as speculative defendant's suggestion that the jury might have been unduly swayed by the fact that defendant selected a young boy as one of his victims.

E. *Ineffective Counsel Claim—Stipulating to Admission of Linda G.'s Guilt Phase Testimony*

Defendant next contends that trial counsel rendered ineffective assistance when he stipulated that Linda G. was unavailable to testify (caused by mental instability), and that her guilt phase testimony could be read in its entirety to the jury at the penalty retrial. Linda had testified concerning defendant's 1978 molestation and oral copulation offenses previously described herein.

According to defendant, his counsel should have objected to this procedure on the basis that defendant's confrontation and cross-examination

rights would be thereby impaired: Although defense counsel had an opportunity to cross-examine Linda at the guilt phase, that opportunity was assertedly "legally inadequate" in light of the different purposes (i.e., determining guilt versus appropriate penalty) for which the testimony was offered during the two proceedings. (See Evid. Code, § 1291, subd. (a)(2) [opposing party "had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing"]; *People* v. *Brock* (1985) 38 Cal.3d 180, 189 [211 Cal.Rptr. 122, 695 P.2d 209].)

We do not think the foregoing differences in purpose are so pronounced as to support defendant's argument. Although the offenses against Linda were admissible for different purposes, trial counsel had a "similar" motive to attack the credibility of Linda's testimony, whether it bore directly on the guilt issue or only on penalty, because the penalty jury would be entitled to consider the offenses committed against her only if proved beyond a reasonable doubt. Thus, there is no reason to believe that counsel's penalty phase cross-examination of Linda would have been substantially different from his guilt phase examination.

Moreover, counsel had reasonable, tactical reasons for stipulating to Linda's unavailability: As he expressed on the record, he believed Linda's recorded testimony would have less impact on the jury than if presented "live" by her, especially if she was unable to control her emotions during counsel's questioning. (Her current unstable mental condition was apparently caused by defendant's assault on her.)

We conclude that counsel was not incompetent in failing to raise a confrontation objection to the reading of Linda's guilt phase testimony.

### F. *Assorted Evidentiary Rulings*

Defendant claims a number of assertedly incorrect evidentiary rulings prejudiced him. We conclude that any such errors, whether viewed separately or in the aggregate, do not require reversal of penalty.

1. *Detective Bruce's Testimony*—An Arizona policeman, Robert Bruce, testified regarding the Dawn F. assault. According to Bruce, he conducted a photographic lineup using "a picture of [defendant], FBI number 751791-D," along with photos of two other men. In addition, Bruce obtained from the St. Louis police an "update mugshot" of defendant. On defendant's objection to the admission of the photos, the court excluded them, but it failed to strike Bruce's testimony. ■ Defendant claims he was

prejudiced by the foregoing testimonial references to photos of him in the possession of two separate law enforcement agencies.

As the People observe, defendant waived the point, having failed to move to strike the Bruce testimony. His only objection occurred *after* the testimony was elicited, when the People sought to admit the photos. Moreover, in light of the substantial evidence of defendant's other assaults and molestations, it is apparent that he was not prejudiced by the foregoing testimony. The jury would hardly find it surprising that law enforcement agencies possessed photos of repeated offenders such as defendant.

2. *Brian J.'s Testimony*—After Brian J. testified as previously described, the prosecutor elicited from him the fact that he was himself in custody awaiting sentencing on a larceny charge, but that no promises were made to induce his testimony. On cross-examination, defense counsel explored this subject further, determining, among other things, that Brian was told by the prosecutor that a letter would be written to Missouri authorities informing them of his cooperation. As Brian testified, the letter was not conditioned on his testimony against defendant.

Thereafter, the prosecutor called Randal Lamb, the Illinois deputy sheriff who had interviewed Brian following the assault. Over objection, Lamb's written report of the interview was admitted as evidence of Brian's prior consistent statements regarding the assault. ■ Defendant now contends that such statements were inadmissible under Evidence Code section 791. That section allows evidence of a witness's prior consistent statements offered after "[a]n express or implied charge has been made that his testimony . . . is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (See also Evid. Code, § 1236.)

The trial court found that defendant's cross-examination of Brian impliedly attacked Brian's testimony as being improperly motivated by promises of leniency. Although, as defendant observes, the prosecutor initiated inquiry into this subject by eliciting the fact of Brian's custody, it was defense counsel who, through cross-examination, implied that Brian may have had a possible improper motive. Accordingly, the conditions of Evidence Code section 791 were met, and the court did not err in admitting Brian's prior consistent statements.

3. *Photographs of Victims While Alive*— ■ Defendant contends the court erred in allowing the prosecutor to admit and refer to childhood

photos of each of defendant's "other crimes" victims, as well as two photos (one very recent) of murder victim Amy S. According to defendant, these photos were irrelevant to the penalty phase issues and were used by the prosecutor solely to inflame the jury against him. Defendant observes, for example, that during closing arguments the prosecutor displayed Amy's recent photo, and commented on her youth, size and vulnerability.

We considered a similar claim of error in *People v. Hovey* (1988) 44 Cal.3d 543, 576 [244 Cal.Rptr. 121, 749 P.2d 776], involving the prosecutor's use, at both the guilt and penalty phases, of a "portrait-style" photograph of the young murder victim for the apparent purpose of gaining sympathy for her. As we stated in *Hovey*, "some appeals to sympathy are proper at the penalty phase where the jury must 'weigh the sympathetic elements of defendant's background against those that may offend the conscience,' so long as no wholly irrelevant information or inflammatory rhetoric is employed. (*People v. Haskett* [1982] 30 Cal.3d 841, 863 [180 Cal.Rptr. 640, 640 P.2d 776]; see *People v. Fields* [(1983)] 35 Cal.3d [329], 362, fn. 14 [197 Cal.Rptr. 803, 673 P.2d 680].) Although trial courts should discourage use of the victim's photograph solely to invoke a sympathetic reaction at the penalty phase, any error here was clearly harmless and could not have affected the verdict." (44 Cal.3d at p. 576, fn. omitted.)

The trial court herein justified admission of the photos on the basis that significant time had passed since the guilt phase, and it was appropriate to "put the victims in the proper setting" as to the various "events in question, age, sizes, vulnerability . . . ." That ruling seems reasonable. The prosecutor was entitled to present evidence regarding "the circumstances of the crime" (former § 190.3, factor (a)), which would at least include a photo of Amy. As for the other victims, as in *Hovey*, any error in admitting these ordinary, nongruesome photos, or using them to gain a measure of sympathy from the jury, was clearly harmless in light of the other aggravating evidence in the case. (See *Hovey, supra*, 44 Cal.3d at p. 576.)

4. *Photographs of Injuries to Rynetta C.*—Additionally, the prosecutor introduced three photos displaying the injuries to "other crimes" victim Rynetta C. These photos each depicted flesh wounds to the victim's stomach and genital area. ■ Defendant contends there was insufficient authentication of the photos to justify their admission.

Defendant made no objection to the photos, and thus waived his right to complain of the failure to properly authenticate them. (See *People v. Allen* (1986) 42 Cal.3d 1222, 1271 [232 Cal.Rptr. 849, 729 P.2d 115].) His claim that counsel's asserted incompetence in this regard prejudiced him is without merit. We have examined the photos, and we are convinced there is no

reasonable probability their admission affected the jury's verdict. (See *Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052].)

5. *Photographs of Injuries to Amy S.*—Defendant next contends the court erred in admitting five photos of murder victim Amy S. which disclosed the various injuries inflicted by defendant. On defendant's objection, the court examined these photos and weighed their relevance against their potential prejudicial effect. (Evid. Code, § 352.) The court agreed that the photos were "gruesome," but nonetheless admitted them after observing that "no one photograph displays all of the apparent injuries on the body," and "they are highly relevant."

Defendant contends the photos were largely cumulative of medical testimony regarding the victim's injuries. He also argues that the prosecutor made unfair use of one such photo in his closing argument, asking the jury to compare the photo of Amy when alive with one showing her "dusty and mangled lying out there in the dirt all naked. He [defendant] took this little girl and he trashed her." Although defendant failed to object to this argument (see *People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468]), he suggests it reinforces the claim that an abuse of discretion occurred here.

Having examined the five photos, we find no abuse of discretion in admitting them. (See *People* v. *Carrera* (1989) 49 Cal.3d 291, 329 [261 Cal.Rptr. 348, 777 P.2d 121].) As for the prosecutor's subsequent use of the photos to gain jury sympathy for the murder victim, defendant's failure to object bars consideration of the issue on appeal.

In any event, it is not reasonably possible that the admission of the photos, or their use by the prosecutor during closing argument, affected the penalty verdict in this case. As the prosecutor pointed out immediately following his use of the photos in closing argument, "you [the jury] don't have to be angry; you don't have to be emotional; I think all you have to do is reflect on the purpose of the death penalty, on its function, on its justice."

Additionally, defendant contends that introduction of Amy's photos violated the principles expressed by the high court in *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2077] and *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529]. We believe the admission of such photos does not amount to impermissible "victim impact" evidence of the kind condemned in those cases. Any such error, moreover, would be harmless beyond a reasonable doubt. (See *People* v. *Adcox* (1988) 47 Cal.3d 207, 259-260 [253 Cal.Rptr. 55, 763 P.2d 906];

*People* v. *Hendricks* (1987) 43 Cal.3d 584, 594-595 [238 Cal.Rptr. 66, 737 P.2d 1350].)

6. *Cumulative Effect of Errors*—Finally, defendant argues that the cumulative effect of the various assertedly erroneous evidentiary rulings discussed above was to unduly prejudice the verdict. As we have seen, however, several of these claims of error were waived for failure to object, while other such claims lack merit. We find the cumulative effect of the few remaining errors too slight to warrant reversal of the penalty judgment.

## G. *Prosecutorial Misconduct*

Defendant next asserts the prosecutor committed misconduct during his cross-examination of a defense witness, and in his closing arguments. We conclude that any misconduct was too minor to have affected the verdict.

1. *Cross-examination of Dr. Rosenthal—* The prosecutor asked Dr. Rosenthal, a defense psychiatrist, whether he had reviewed an essay by defendant entitled "What I Have Learned About Sadism." Receiving an affirmative response, the prosecutor commenced to question Dr. Rosenthal about the essay, but defendant's objections were sustained. Defendant now asserts the prosecutor's mere reference to the title of his essay may have prejudiced him. We think the matter too minor to have caught the jury's attention—the title was essentially content neutral, and in any event the jury already knew of defendant's sadistic disposition from the description and photographs of the injuries inflicted on Amy and many of his other victims.

2. *Closing Argument*

Defendant also cites as misconduct two portions of the prosecutor's closing argument. Because defendant neither interposed an objection nor sought an appropriate admonition as to these remarks, any misconduct claim was waived. (*People* v. *Green, supra,* 27 Cal.3d 1, 27.) We have rejected the contention that *Green* is inapplicable to misconduct occurring during the penalty phase of a capital case. (*People* v. *Miranda, supra,* 44 Cal.3d at p. 108, fn. 30.) Nor would defense counsel's failure to object or seek an admonition constitute inadequate representation. The failure to object to evidence or argument usually involves tactical considerations on counsel's part and seldom would demonstrate his incompetence. (See *People* v. *Jackson* (1980) 28 Cal.3d 264, 292 [168 Cal.Rptr. 603, 618 P.2d 149].) In any event, as we shall see, the matters at issue were relatively minor and could not have affected the jury's verdict.

We briefly review the claims on their merits. Defendant first cites that part of the prosecutor's closing argument expressing doubts about the

validity of Dr. Rosenthal's opinion regarding defendant's mental condition. The prosecutor asked rhetorically, "What evidence do we have [of defendant's mental disorder]? We have an opinion by the doctors, two psychiatrists. Rosenthal, *who is in my judgment just a hired opinion . . . .*" (Italics added.)

Defendant maintains the foregoing remark constituted an improper expression of the prosecutor's personal opinion drawn from facts not in evidence. (See *People* v. *Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564].) To the contrary, we think the prosecutor was simply observing that Dr. Rosenthal was a hired expert paid to express his opinion regarding defendant's mental condition. Although in context the remark was somewhat insulting in its implications, we find no misconduct of the sort condemned in *Bain*.

Next, defendant complains of prosecutorial argument referring to certain "other crimes" not properly submitted to the jury. First, the prosecutor briefly mentioned defendant's "kidnapping" of Brian J., but the trial court had previously limited the potential "other crimes" arising out of that incident to the offenses of battery and lewd and lascivious acts with a child.

Second, the prosecutor described the Rynetta C. incident as one in which defendant "was working out on her body his own private sexual agenda, because this is his need. This gives him sexual excitement." The court had limited the potential crimes arising therefrom to kidnapping and aggravated battery; no sex offenses were included.

We believe the prosecutor's foregoing references were harmless, especially in light of the fact the court expressly limited the jury's consideration to the particular offenses covered in the "other crimes" instructions. There is no reasonable possibility the jury considered any other offenses as aggravating factors merely because of the prosecutor's inadvertent or inaccurate characterization.

H. *"Double Counting" of Aggravating Factors*

As previously indicated, the court instructed the jury regarding the various "other offenses" potentially subject to consideration as aggravating factors if proved beyond a reasonable doubt. For example, the jury was told that with respect to the Rynetta C. incident, evidence was offered to show that defendant committed the crimes of kidnapping and battery. Two of the other incidents (involving Linda G. and Lashonda B.) likewise each potentially entailed the multiple offenses of kidnapping and commission of a lewd and lascivious act.

Defendant now contends that, as to all three incidents, the kidnapping charge was incidental to the battery or lewd act offenses, and accordingly the jury may have "double counted" the number of other crimes attributable to defendant. (See *People v. Harris* (1984) 36 Cal.3d 36, 64-65 [201 Cal.Rptr. 782, 679 P.2d 433] [plur. opn.] [improper to double-count special circumstances that arise out of single, indivisible course of conduct].)

Although defendant could not have been *punished* for any incidental kidnappings occurring during these incidents (see § 654; *People v. Beamon* (1973) 8 Cal.3d 625, 637 [105 Cal.Rptr. 681, 504 P.2d 905]), we have held in an analogous situation that section 654 and its proscription against multiple punishment do "not preclude a capital penalty jury from considering that the murder was committed in the course of both a robbery and a burglary." (*People v. Melton, supra,* 44 Cal.3d at p. 768; see also *People v. Bean* (1988) 46 Cal.3d 919, 954-955 [251 Cal.Rptr. 467, 760 P.2d 996].) ▮ Similarly, no reason appears why a capital jury should not consider, for penalty determination purposes, the fact that defendant's "other crime" actually involved multiple criminal offenses.

Moreover, assuming error occurred, it is not reasonably possible the jury's penalty verdict was affected by a determination that defendant committed more "other crimes" than technically punishable. Realistically, the jury would have been influenced more by the nature of defendant's underlying conduct than the number of actual "crimes" arising therefrom. We conclude no prejudicial error occurred.

I. *"Double Counting" of Kidnapping Offense*

In his supplemental brief, defendant raises a related contention, namely, that the jury was improperly permitted to "double count" the kidnapping that formed the basis for the kidnapping-murder special circumstance. (Former § 190.2, subd. (c)(3)(ii).) The instructions permitted the jury to consider both the circumstance of the crime and the existence of any special circumstance found to be true. (Former § 190.3, factor (a).)

The jury selected to retry the penalty issue was told that defendant previously had been found guilty of murder in the first degree, and that a special circumstance had been found true. But the jury was not told that the special circumstance was based on a murder during a kidnapping. Thus, defendant suggests, the jury may have counted the kidnapping-murder circumstance twice, once as a "circumstance of the crime," and once as a "special circumstance."

We think it is not reasonably possible that the jury mistakenly assumed the applicable special circumstance involved elements additional to the

circumstances of the offense itself, or gave undue weight to the kidnapping offense. (See *People* v. *Murtishaw* (1989) 48 Cal.3d 1001, 1019 [258 Cal.Rptr. 821, 773 P.2d 172].)

### J. *Refusal to Give Requested Instructions*

Defendant next complains of the court's refusal to give various instructions requested by him. We find no merit to any of these assignments of error.

1. *Eyewitness Identification—* ■■■ Defendant requested a special instruction that would have cautioned the jury regarding eyewitness identification testimony not meeting certain conditions (i.e., adequate opportunity to observe, positive identification of defendant, no prior failure to identify or inconsistency in identifying defendant, no equivocation during cross-examination). The proposed instruction recited that if any of these conditions was absent, the jury should scrutinize the witness's testimony with care. The court declined to give this instruction because another similar instruction on the subject (CALJIC No. 2.92) was given.

CALJIC No. 2.92 likewise lists various factors for the jury to consider in evaluating a witness's testimony, including his opportunity to observe the act and actor, his possible stress during the observation, his ability to provide a description of the perpetrator that matched defendant, his ability to make a photographic or live lineup identification of defendant, the certainty or uncertainty of his identification, and similar factors (including the "catchall" phrase, "Any other evidence relating to the witness' ability to make an identification").

We have indicated that CALJIC No. 2.92 "will usually provide sufficient guidance on eyewitness identification factors," although the defendant may be entitled to a special instruction specifically directing the jury's attention to other evidence in the record. (*People* v. *Wright* (1988) 45 Cal.3d 1126, 1141 [248 Cal.Rptr. 600, 755 P.2d 1049].) Defendant fails to indicate in what material aspect CALJIC No. 2.92 was inadequate or improper in this case. Indeed, it appears that three of the four factors listed in defendant's proposed instruction were in substance included in CALJIC No. 2.92, and the fourth, focusing on a witness's possible equivocation during cross-examination, involved a matter of obvious import to any reasonable juror.

Defendant observes that during the initial reading of CALJIC No. 2.92, the court inadvertently indicated the instruction would apply to testimony identifying defendant as the perpetrator of "the *other* criminal activity involving force and violence." (Italics added.) He correctly notes that the

instruction was intended to apply to the *charged* offenses as well. But the instruction was later *reread* to the jury without the foregoing erroneous qualification. Despite the court's misstatement, we conclude the jury was not misled to his prejudice by the initial limiting language.

2. *Nonextreme Mental Disturbance—* Defendant requested an instruction stating that in determining mitigating circumstances, the jury could consider whether the offense was committed while defendant was under the influence of *any* mental or emotional disturbance. The court refused to so instruct on the ground that other instructions adequately covered the point. Defendant disagrees, observing that the instruction covering the mitigating effect of his mental or emotional disturbance was limited to the effect of "extreme" disturbances.

We held in *People* v. *Ghent, supra,* 43 Cal.3d 739, 776, that an instruction modeled on the "catchall" provision in former factor (j) of section 190.3 ("any other circumstance which extenuates the gravity of the crime") was adequate to allow jury consideration of the defendant's nonextreme mental condition. (Accord, e.g., *People* v. *Bean, supra,* 46 Cal.3d 919, 953-954.) In the present case, the court gave a similar "catchall" instruction, and further specifically advised the jury at defendant's request that it could consider "any other aspect of the defendant's character or record . . . offer[ed] as a basis for a sentence less than death . . . . The defense, for example, offered evidence of Mr. Frank's . . . mental disease." Finally, the court explained that "Your consideration of mitigating factors is not limited to those which have been given to you."

We conclude the jury was adequately instructed with respect to the mitigating effect of defendant's nonextreme mental condition.

3. *Appropriateness of Death Penalty Beyond a Reasonable Doubt*—Defendant contends the court erred in refusing to instruct the jury that if it had a reasonable doubt as to which penalty to impose, it should select life imprisonment without parole. We have rejected similar claims of error on several occasions. (E.g., *People* v. *Robertson, supra,* 48 Cal.3d 18, 63; *People* v. *Jennings* (1988) 46 Cal.3d 963, 992 [251 Cal.Rptr. 278, 760 P.2d 475]; *People* v. *Williams* (1988) 44 Cal.3d 883, 960-961 [245 Cal.Rptr. 336, 751 P.2d 395].)

K. *Ineffective Counsel Claim—Age Factor*

 Defendant next contends his trial counsel was ineffective in failing to ask the court to include the subject of defendant's age as a potential mitigating factor. Unlike the case in which all the statutory sentencing

factors are read to the jury, here the prosecutor and defense counsel stipulated that any "inapplicable" factors could be deleted. (Cf. *People* v. *Marshall* (1990) 50 Cal.3d 907, 932-933 [269 Cal.Rptr. 269, 790 P.2d 676].) The prosecutor had originally believed that defendant's age was an aggravating factor, but the court opined that age could only be a mitigating factor. (But see *People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal Rptr. 1, 753 P.2d 1052].)

Accordingly, the prosecutor agreed to the deletion of age as a sentencing factor "unless the defense wants it in and wants to argue it in mitigation." Defense counsel thereupon agreed to the deletion of age as a mitigating factor, reserving his right to point out to the jury his client's limited life span should life imprisonment without parole be selected as a penalty. (In fact, counsel presented such an argument.)

Defendant now suggests that counsel's stipulation deprived defendant of an important mitigating factor. Under the circumstances here, the point lacks merit. Unlike the very youthful or elderly defendant, whose age may well constitute a significant mitigating factor, it is difficult to see how defendant's age (51 at time of trial) could have been viewed as a mitigating or extenuating circumstance. Counsel may well have chosen, as a tactical matter, to downplay references to age in light of the extreme youth of most of his victims. Moreover, despite the instructional omission, counsel was free to argue, and did argue, defendant's age as a relevant mitigating circumstance. Accordingly, it is not reasonably probable that counsel's omission affected the penalty verdict. (See *Strickland* v. *Washington*, *supra*, 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698].)

### L. Statement of Murder Victim's Grandmother

Defendant next contends the court erred in allowing the murder victim's grandmother, Mrs. Linebaugh, to make a statement prior to its ruling on defendant's motion for modification of sentence. Among other things, Mrs. Linebaugh thanked the jury for its verdict, thanked the voters for achieving "a more qualified Supreme Court to consider the arguments," reminded the court that defendant was a "child murderer" who never denied killing Amy, implored the court to "give him the penalty he so deserves," and wished that there was an even "more maximum" penalty that could be imposed. The court thereupon denied the motion to modify sentence.

Recent decisions of the United States Supreme Court deem most "victim impact" and "victim character" evidence irrelevant to the sentencing decision and potentially prejudicial to the defendant's plea for a lesser punish-

ment. (See *South Carolina* v. *Gathers, supra,* 490 U.S. 805 [prosecutor's argument regarding victim's good character]; *Booth* v. *Maryland, supra,* 482 U.S. 496 [victim impact statements].)

Neither case involves the admissibility of victim impact or character evidence at a sentencing hearing by the trial court following the jury's verdict. (See *People* v. *Siripongs* (1988) 45 Cal.3d 548, 585-586, fn. 12 [247 Cal.Rptr. 729, 754 P.2d 1306].) Thus, we have stated that "the Eighth Amendment considerations" expressed in *Booth/Gathers* "are not implicated" in a modification hearing under section 190.4. (*People* v. *Jennings, supra,* 46 Cal.3d at pp. 994-995; see *People* v. *Lang* (1989) 49 Cal.3d 991, 1043-1044 [264 Cal.Rptr. 386, 782 P.2d 627].) Nonetheless, as we explained in *Jennings,* that section does limit the court's consideration to the evidence available to the jury. (46 Cal.3d at p. 994.)

In the present case, the prosecutor asked the court if it would allow Mrs. Linebaugh to speak, stating that he had explained to her that her remarks would not play a part in the court's decision. The court agreed to let Mrs. Linebaugh speak. After hearing her statement and the argument of counsel, and prior to announcing its ruling, the court indicated that its determination was based *only on the evidence considered by the jury.* The court reviewed the penalty phase evidence, and stated that it had made an "independent determination that the weight of the evidence supports the jury's verdict. The mitigating factors pale in comparison to the circumstances of the murder."

Unlike cases in which the record affirmatively discloses the court's reliance on improper or inadmissible evidence in making its ruling on the modification motion (e.g., *People* v. *Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892] [reliance on probation report]), in the present case the record strongly supports a contrary finding. We conclude that admission of Mrs. Linebaugh's statement does not require reversal or remand of the court's denial of defendant's modification motion. We suggest, however, that in future cases the preferred practice would be to admit such statements, if at all, only *after* the court has ruled on the modification motion.

M. *Nondisclosure of Defendant's Prison Records*

██ Finally, defendant asserts the trial court erred in refusing him access to his entire prison record. Prior to trial, defendant sought to examine his prison records, including a file labelled "confidential." The court examined this file in camera, and allowed defendant access to a portion of it, without explaining why the remainder was undisclosed. Defendant specu-

lates that some undisclosed material may have been relevant to the penalty trial.

As the People observe, during the course of ruling on defendant's posttrial motion to augment the appellate record to include the foregoing confidential file, we examined that file and expressly stated that it contained nothing of relevance to the case. (See Supreme Court minute order of June 30, 1988.) Accordingly, defendant was not prejudiced by the trial court's failure to allow him access to the entire file.

The judgment is affirmed in its entirety.

Mosk, J., Broussard, J. Panelli, J., Eagleson, J., Kennard, J., and Arabian, J., concurred.

Appellant's petition for a rehearing was denied December 20, 1990.