Filed 12/23/13  P. v. MacKenzie CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DONALD JOSEPH MACKENZIE III,<br><br>    Defendant and Appellant. | B236878<br><br>(Los Angeles County<br>Super. Ct. No. YA078248)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on November 25, 2013, be modified as follows:

On page 5, the fourth sentence of the last paragraph, the word "would" is changed to "could" so that the sentence reads:  "Mr. Kordic told Deputy Jimenez that he believed appellant could carry out the threat."

On page 8, the last sentence of the first paragraph, the word "husband" is added so that the sentence reads:  "Mrs. MacKenzie obtained a restraining order against Mr. Hatefi and Mr. Hatefi tried to obtain one against her husband."

Beginning on page 10 through page 23, all references to "Markham" should be changed to "Markman."

There is no change in the judgment.

The petition for rehearing is denied.

_____
            BOREN, P.J.                    FERNS, J.*

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B236878 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA078248) |
| v. | |
| DONALD JOSEPH MACKENZIE III, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Eric C. Taylor, Judge.  Affirmed.

William L. Heyman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Russell A. Lehman, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Donald Joseph MacKenzie III appeals from the judgment entered upon his conviction by jury of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1), count 1),[1] two counts of making criminal threats (§ 422, counts 2 and 4), and failure to care for an animal (§ 597f, count 3).  The trial court sentenced appellant to a prison term of three years and eight months.  The court selected the middle term of three years on count 1, and a consecutive eight months (one-third the middle term) on count 2.  On count 4, the trial court imposed a consecutive eight-month term and stayed the sentence under section 654.  Appellant was ordered to serve six months in Los Angeles County Jail for the misdemeanor conviction on count 3.

Appellant contends (1) the prosecution committed misconduct and trial counsel rendered ineffective assistance of counsel during jury voir dire, (2) the trial court erred when it allowed the prosecution to present rebuttal evidence and denied the defense request to present surrebuttal evidence, (3) the trial court erred in failing to instruct the jury sua sponte with the unanimity instruction on counts 2 and 4, (4) the trial court erred by placing time limits on the parties' closing arguments, (5) there was insufficient evidence to support his convictions on counts 1, 3, and 4, and (6) his convictions for counts 2 and 4 were unlawful.

We affirm.

## FACTS

**Prosecution Evidence**

On the evening of June 5, 2010, Pete and Monica Kordic and their three children attended a graduation party at a neighbor's house.  When they returned to their home at approximately 10:30 p.m., Mr. Kordic noticed someone standing next to his company work van, which was parked in the street in front of his house.  The individual was photographing the van and from the illumination of the camera flash Mr. Kordic could see the van had been painted with graffiti.  As Mr. Kordic approached the van, the person

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

4

taking the photographs ran across the street to the driveway of appellant's house. Mr. Kordic called the police and reported the vandalism.

Los Angeles County Sheriff's Department (LACSD) Deputy John Huerta arrived at the Kordic residence sometime after 11:00 p.m. The van which had been "tagged" with spray paint was parked on the street. Mr. Kordic pointed out a CD cover that was on the ground in the driveway behind Mrs. Kordic's parked Chevrolet Suburban. The cover was from a CD entitled "Megadeath, Killing is my business." While Mr. and Mrs. Kordic were talking to Deputy Huerta on the street, they noticed flashes of light coming from appellant's house. Mr. Kordic yelled "Hey, there he is." Deputy Huerta saw a person leave the area from where the flashes had come and go into appellant's house. When that person went inside all of the interior and exterior lights were turned off. Deputy Huerta called for additional backup units.

When the additional units arrived, Deputy Huerta went to appellant's residence and knocked loudly on the door. He announced he was with the sheriff's department and wanted to perform a safety check. Appellant's mother Socorro MacKenzie came out and told Deputy Huerta that the only other person in the house was appellant, her son. Appellant came outside and was excited and agitated. Deputy Huerta examined appellant's hands and clothing and found no spray paint on them. Deputy Huerta talked about the vandalism to the van parked outside the Kordic residence and asked appellant about it. Appellant said he only took a photograph of the van and then continued home. Appellant showed Deputy Huerta the photographs in his camera, including a photograph of Mr. Kordic's van. Deputy Huerta returned to the Kordic residence and told them he had spoken with appellant and his mother. He told them he had completed his investigation and there was nothing else to be done.

On June 6, 2010, Mr. Kordic parked his work van in his driveway. He had purchased some cleaning products and began to remove the graffiti from the van. Mrs. Kordic came outside and gave him some additional cleaning materials. As Mr. Kordic was cleaning the van, they both heard yelling coming from a window of a room at appellant's house. A younger male voice yelled, "This is my street. Get the fuck

5

off my street. I've been here 25 years. You called the fucking police on me?" There was a moment of silence and then the voice yelled, "I'm going to kill them all." At 1:07 p.m. Mrs. Kordic called the sheriff's station. She was "very concerned" that the threats were "geared and directed directly toward" her family. The deputy who answered the telephone advised Mrs. Kordic to obtain a restraining order and transferred her to Deputy Huerta's voicemail.

Mr. Kordic finished cleaning the graffiti from the work van and began to move it back onto the street. As he was backing out of his driveway, appellant ran into the middle of the street and yelled something that Mr. Kordic did not hear. Appellant got into a white truck at his residence and revved the engine. Appellant's father told him not to get into the truck. Appellant backed out of his driveway and pulled up in front of the Kordic residence. The windows of appellant's truck were down and appellant had his dog with him in the truck. Appellant looked at Mr. Kordic and told him he was going to kill Mr. Kordic's whole family and slash their throats. Mr. Kordic was in fear for himself and his family. Mrs. Kordic came outside to the front porch when she heard appellant's truck revving. She saw appellant, who was yelling, make a motion with his hand across his throat. Mrs. Kordic did not hear the exact words appellant used and asked Mr. Kordic what appellant had said. Mr. Kordic related that appellant said, "I'm going to kill you and your whole family and I'm going to slice your throats." Appellant sped off in the truck down the street.

Jaleh Hatefi was walking up the street returning home from grocery shopping. There was no sidewalk and Mrs. Hatefi was walking uphill near the curb of the street. She was carrying bags of groceries and walked with her head down and slightly slouched over. Mrs. Hatefi heard the engine of appellant's truck and looked up and saw appellant driving towards her. Appellant looked at Mrs. Hatefi and while keeping his right hand on the steering wheel extended his left hand out the window and raised his middle finger. Mrs. Hatefi jumped out of the way onto the grass on the other side of the curb. Appellant's truck came within two feet of striking Mrs. Hatefi. A few minutes after appellant sped away down the street, appellant's mother left her home driving a White

6

Ford Explorer. Appellant's mother stopped and had a conversation with the Kordics before driving off in the same direction as appellant.

At 1:34 p.m., Mrs. Kordic called the sheriff's station. She reported that appellant came in front of the Kordic's house and threatened to kill the entire Kordic family and slice their throats. Mrs. Kordic was scared and crying after she and her family were threatened by appellant. Mrs. Hatefi saw that Mrs. Kordic was crying and distressed. Mrs. Hatefi went home and told her husband that appellant had driven his truck towards her. Mr. Hatefi called the police.

Shortly before 2:00 p.m. that afternoon, LACSD Deputy Erick Moultrie responded to the Kordic residence to investigate a disturbance call that a person was threatening his neighbors. He saw several people standing on the street and was flagged down by Mr. Hatefi. Mr. Hatefi told Deputy Moultrie that appellant had tried to run over Mrs. Hatefi. Mr. Hatefi pointed to appellant who was walking down the street with a large black and white "shepherd-type" dog. The dog was not on a leash. Deputy Moultrie called out to appellant and ordered him to stop. Appellant looked in Deputy Moultrie's direction and continued walking. Deputy Moultrie was wearing his standard sheriff's department uniform and his patrol car was parked on the street in clear view. Deputy Moultrie approached appellant and again ordered him to stop. Appellant stopped in front of his own house and his dog started barking viciously at Deputy Moultrie. The dog growled and bared his teeth. Deputy Moultrie drew his duty weapon and ordered appellant to secure his dog. Appellant told Deputy Moultrie "I don't give a fuck. Go ahead and shoot the dog, and you can shoot me, too." Appellant's family members came out of the house and secured the dog. Deputy Moultrie detained appellant.

LACSD Deputy Pablo Jimenez and his training officer, Deputy Capra, also went to the Kordic residence in response to the disturbance call. Mr. Kordic told Deputy Jimenez that appellant said he was going to kill the whole Kordic family and slash their throats. Mr. Kordic said that appellant yelled at his neighbors, had a violent temper, and was mentally unstable. Mr. Kordic told Deputy Jimenez that he believed appellant would carry out the threat. Mrs. Kordic told Deputy Jimenez that appellant told her husband

7

that he was going to kill the Kordic family by slashing their throats. Mr. Kordic also informed Deputy Jimenez that appellant tried to hit Mrs. Hatefi with his car.

Deputy Jimenez talked to appellant who was being detained by Deputy Moultrie. Appellant denied threatening to kill anyone or run over anyone. He stated he would never try to run over any women or children. He claimed his neighbors were spying on him and jumped over his fence and stole from him. Appellant's vehicle was located about a block away from his house. When asked by Deputy Jimenez, appellant had no explanation why it was parked there.

Since the incident, Mr. Kordic lived in fear of appellant. He kept his children in the backyard and installed surveillance cameras. He constantly looked over his shoulder and was afraid to be in the front of his house. Mrs. Kordic was in fear of appellant because of the unpredictability of his actions.

On July 17, 2010, appellant wrote and sent a letter to a neighbor which included the following statements: "I'm sure you are aware of the big sting. Hell, I would do it again in a heartbeat to protect my land and those I love." "I hope that blond cunt, that one across the street, don't read this." "I start trial on Thursday, July 22 in Torrance. So far the Iranian has not showed up and, guess what? If he don't show up, we'll get the case tossed."

**Defense Evidence**

Appellant's mother Socorro MacKenzie lived with her husband, and their sons, appellant and Sean, across the street from the Kordics. Mrs. MacKenzie was asleep in her house on the night of June 5, 2010. She testified to the following: She heard knocking and got up to answer the door. Two sheriff's deputies were at the door and they informed her that they were investigating a report of vandalism on the street. They asked to speak with appellant. One of the deputies entered the house and spoke with appellant but did not arrest him.

Around 2006 or 2008, appellant was diagnosed with bipolar disorder and manic depression. When manic, appellant did not eat or sleep and was delusional. He would claim to have a great deal of money or a worldwide business and would talk about buying

8

a ranch and moving to Texas. Mrs. MacKenzie believed appellant was experiencing a manic episode in the days preceding the visit by the sheriff's deputies. At approximately 11:00 a.m. on June 6, 2010, the MacKenzies took away appellant's car and parked it away from their house so that he could not leave. In the past, appellant was beaten up and robbed while experiencing manic episodes. The MacKenzies also had a 1965 white Chevrolet pickup truck which was difficult to start and stalled if not warmed up properly. They planned to disable the truck later that day.

On June 6, 2010, appellant was angry when he awoke to find his car was missing. Appellant and his parents yelled at each other for a few minutes. Mrs. MacKenzie did not hear appellant make any threatening statements to anyone across the street or hear him yelling about people calling the police on him. Appellant grabbed the keys for the pickup truck and left the house through the front door. Mr. MacKenzie pleaded with appellant to return and yelled at the dog to come back in the house. Appellant backed out of the driveway and drove away. The dog was in the truck with him.

Mrs. MacKenzie got in her 2002 Ford Explorer and followed appellant down the street. She followed inches behind the truck appellant was driving. She saw him drive past the Kordic residence and did not see him make any threats to the Kordics. Mrs. MacKenzie never had any contact with the Kordics prior to the incidents in June 2010. She did not stop and have a conversation with them and she did not tell them that appellant had mental illness problems. She saw a number of people on the street but did not see Mrs. Hatefi. She never saw appellant swerve the truck at anytime. She followed appellant closely and did not lose sight of him for approximately half a mile until she had to stop at a traffic light. Mr. MacKenzie attempted to locate appellant by tracking his cell phone position and relaying the information to Mrs. MacKenzie but was unable to do so. Mrs. MacKenzie returned home after about half an hour and saw appellant being arrested by sheriff's deputies.

Several hours after appellant was arrested, Mr. Hatefi came to the MacKenzie residence and told Mrs. MacKenzie that "he had a gun and mace at his front door." He said he was going to press charges against appellant for trying to run over Mrs. Hatefi

9

unless their attorneys sat down and reached a settlement. The MacKenzies installed video surveillance cameras around their house because they were concerned about false allegations against appellant. While appellant was incarcerated, the cameras recorded Mr. Hatefi looking into appellant's bedroom with binoculars. Mrs. MacKenzie obtained a restraining order against Mr. Hatefi and Mr. Hatefi tried to obtain one against her.

On July 1, 2010, Mrs. MacKenzie was driving down the street when she saw Mrs. Kordic and stopped to talk to her. Mrs. MacKenzie told Mrs. Kordic that she had recently learned that for years Mr. Kordic had given threatening looks to her sons. Mrs. MacKenzie demanded an explanation for Mr. Kordic's behavior. Mrs. Kordic said her husband did not do it.

Mr. Hatefi testified that when his wife returned home from grocery shopping she told him that appellant drove his truck at her. At 1:56 p.m. on June 6, 2010, he called 9-1-1 and the operator told him that a unit was on the way because a neighbor had previously called about a disturbance. Mr. Hatefi spoke to the first deputy who arrived on the scene. After appellant was detained Mr. Hatefi was handcuffed and placed in a police car because he responded to remarks made by appellant. On October 15, 2010, Mr. Hatefi sent a letter to the attorney representing appellant and his parents. In the letter, Mr. Hatefi said he would pursue legal options if the MacKenzies did anything to a retaining wall between their properties. On January 6, 2011, Mr. Hatefi testified at appellant's bail hearing. He told the court that prior to appellant's arrest on June 6, 2010, Sean MacKenzie told the sheriff's deputy that appellant was stealing from people, painting people's cars, throwing eggs at people's houses, was a drug addict and a criminal.

Sean MacKenzie was appellant's younger brother by seven years. He testified to the following: Prior to June 6, 2010, he had never spoken to Mr. Kordic but he had seen Mr. Kordic give him and appellant "harassing looks" every time they went outside. Appellant got very upset when Mr. Kordic stared at him. On June 6, 2010, at approximately 1:00 p.m. Sean heard appellant and his parents arguing about appellant's car. He heard yelling but did not hear appellant direct any threats towards the Kordics

10

across the street. He saw appellant leave the house and start the pickup truck. When Sean drove the pickup truck, it took approximately 25 seconds for the engine to turn over and it tended to stall. It did not have power steering and was difficult to steer. Sean saw the pickup truck stall in the driveway and saw appellant try to get the dog into the truck. Mr. MacKenzie did not want appellant or the dog to leave and an argument ensued. Appellant restarted the truck and Mrs. MacKenzie walked to her car. Sean went inside to help his father track appellant.

About 15 to 20 minutes after appellant drove away in the truck, Sean saw sheriff's deputies speaking to Mr. Hatefi. Approximately 10 minutes later when appellant came back to the house, Mr. Hatefi pointed to him and said, "There he is. Go arrest him." Appellant claimed he had been walking his dog and had done nothing wrong. He attempted to come into his house but Mr. MacKenzie blocked the door because he did not want the deputies entering his house with guns drawn. Appellant then told the deputies to arrest him. When the dog started growling, appellant said, "What are you going to do? Shoot my dog too? Go ahead." Appellant told the sheriff's deputy to shoot both appellant and his dog. Sean denied telling the sheriff's deputy that appellant was a drug addict and a criminal or that he stole from people, painted people's cars, or threw eggs at their houses.

Deputy Jimenez testified that when he initially arrived at the scene he spoke with the Kordics. Deputy Jimenez wrote in his report that Mr. Kordic told him that appellant tried to hit Mrs. Hatefi with his pickup truck, but he did not think that Mrs. Kordic told him that she saw Mrs. Hatefi almost get hit by appellant's vehicle. Both Mr. and Mrs. Kordic told Deputy Jimenez that appellant told Mr. Kordic he was going to kill Mr. Kordic and his entire family by slashing their throats. Mr. Kordic informed Deputy Jimenez that appellant had a violent temper and may be mentally unstable. Deputy Jimenez also testified that Mrs. MacKenzie did not tell him she was a witness and saw everything. He did not speak with appellant's brother.

Appellant also offered the testimony of Dr. Ronald Markman, a psychiatrist, who reviewed appellant's medical history and evaluated him on June 21 and 28, 2011.

11

Dr. Markman opined that appellant had a bipolar disorder. Bipolar disorder involved areas of dysfunction in thinking and emotion and is characterized by wide emotional swings from a very low and depressed state to a very high happy state. Appellant tended to downplay his psychiatric symptoms and Dr. Markman opined that when appellant was in a stable state, he did not present a danger to himself or others and his potential for aggression was no different than the average person.

Dr. Markman opined that on June 5, 2010, when appellant was taking photographs of vandalism on his neighbor's van he was suffering from a mental condition, most likely bipolar disorder. The type of behavior described in the reports was indicative of the manic or upper side rather than the down side. Dr. Markman opined that appellant was in "a very highly agitative state" on June 6, 2010, when he left his residence in his pickup truck. In such a state, appellant would not necessarily initiate violence but would respond with violence if he felt threatened in his immediate environment. In Dr. Markman's opinion, appellant's invitation to Deputy Moultrie to shoot appellant and his dog showed impulsiveness and lack of consideration for the impact the statement might have on people around him. Dr. Markham also reviewed the letter that appellant wrote to his neighbor on July 17, 2010. Based on appellant's statements that he was rich, owned businesses around the world, and was going to marry his neighbor to whom the letter was sent, Dr. Markham opined the letter reflected mental disturbance shown by appellant's misinterpretation and misimpression of events around him.

Dr. Markham opined that bipolar disorder does not "prevent intentional behavior." He stated that such intentional behavior would be considered "impulsive, unpredictable and without thought to the consequences" because that does not enter the individual's thinking process. He concluded that appellant's symptoms would not prevent him from getting angry or acting on his anger.

Appellant did not testify at trial.

**Prosecution Rebuttal Evidence**

Immediately after appellant drove away from the Kordic's residence on the afternoon of June 6, 2010, Mrs. MacKenzie stopped by in her car and asked Mrs. Kordic,

12

"Are you guys okay?" Mrs. Kordic was crying and asked, "What's going on? What happened? What happened? What did we do? Why is he so upset?" Mrs. MacKenzie said she did not know, was sorry and said, "He's been mental since 2002." She told Mrs. Kordic that she was going to find him and talk to him and then drove away in the same direction appellant had gone.

A few weeks later, Mrs. Mackenzie stopped by again at the Kordic residence. She told Mrs. Kordic that she learned from appellant and Sean that Mr. Kordic had been "mad dogging" appellant for two years. Mrs. Kordic stated her husband avoids conflict and it was not in his nature to do something like that. Mrs. MacKenzie stated, "Well, you know, you shouldn't mad dog and you should never mad dog a mental person."

## DISCUSSION

## I.      No Prosecutorial Misconduct or Ineffective Assistance of Counsel Related to Jury Voir Dire

### A.      Contention

Appellant contends that the prosecution committed misconduct by agreeing before jury selection to exclude all evidence of mental illness and subsequently withdrew his agreement after the jury was selected. As a result appellant contends he was denied a fair trial because defense counsel did not voir dire the jury about possible bias against the mentally ill. Appellant also contends he received ineffective assistance of counsel when his attorney failed to question the prospective jurors about any bias they might have with respect to mental illness.

### B.      Waiver

The People assert that appellant waived or forfeited any claim of prosecutorial misconduct because he failed to raise the matter below. We agree. Here, the record shows appellant did not make a timely and specific objection on the grounds of prosecutorial misconduct to the conduct about which he now complains. The objection in the trial court must be "on the same ground" as that asserted on appeal. (*People v. Riggs* (2008) 44 Cal.4th 248, 298.) Accordingly, appellant has forfeited his claim of

13

misconduct.  Even assuming appellant had preserved his prosecutorial misconduct claim, we address the contention and conclude it lacks merit.

### C.    *Relevant Law*

"'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.'" (*People v. Fuiava* (2012) 53 Cal.4th 622, 679.)  "To constitute a violation under the federal Constitution, prosecutorial misconduct must 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'  [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 122.)  "A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'  [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.)

### D.    *Background*

Prior to trial, the prosecution filed a motion to exclude and limit defense psychiatric evidence.  Specifically, the prosecution sought to preclude appellant from offering any evidence in the guilt phase at trial regarding his lack of capacity or ability to control his conduct.  At an Evidence Code section 402 hearing on the morning of the first day of trial, defense counsel acknowledged that evidence of diminished capacity was inadmissible and counsel did not "intend to introduce any mental illness evidence." Counsel added that "diminish actuality" was not appellant's defense but if a door opened "through the witnesses or regarding mental illness at that point in time, [appellant's] position may change" and the defense might bring in evidence of diminished actuality. Defense counsel indicated that it was not planning on having its expert psychiatrist "testify at all because our position is different than a mental illness defense."

The prosecution indicated that there was "no issue" with respect to the motion to exclude and limit Dr. Markham's testimony if defense counsel represented that Dr. Markham was not going to testify and the defense was not going to raise a mental

14

illness defense. However, the prosecution was unclear on what constituted "opening the door" and asked if Dr. Markham would be called if a prosecution witness testified that he or she was afraid of appellant because he or she thought appellant was "crazy." Defense counsel asked that the trial court instruct the prosecution's witnesses not to address mental illness in their testimony.

Defense counsel argued that the letter appellant wrote and sent to a neighbor constituted evidence of mental illness and the defense would call Dr. Markham to testify if the letter was admitted into evidence. The trial court ruled that three statements contained in the letter selected by the prosecution were admissible. The court stated that those statements did not "open the door" to present evidence of mental illness because the specific statements did not mention mental illness. Defense counsel agreed that such limited evidence of the letter did not give rise to an inference of mental illness and again confirmed that the defense did not intend to present any evidence on that issue. Referring to mental illness, the court stated, "At this time any evidence of that is excluded." The prosecution noted that the issue of mental illness may come up because there was evidence that appellant's mother had spoken to the victims, apologized for appellant's actions, and explained that appellant had mental issues. The court asked both sides to tell their witnesses not to go into the area of mental illness. The prosecution stated, "We may revisit that, your Honor, just depending on what the testimony . . . ."

After the jury was selected, but before opening statements, the prosecution referenced the earlier discussions and the trial court's ruling regarding mental illness and stated he was bringing the issue up because "it relates to the fear of the victims and it's in some commentary in the recordings that will be introduced." The prosecution explained that the victims related in the 9-1-1 calls that they believed appellant to be mentally ill. That testimony was relevant to establish the sustained fear element of section 422. Defense counsel stated that if the prosecution presented such evidence, the defense would call Dr. Markham to testify that appellant suffered from a mental illness, and that appellant's mental illness would not cause him to be violent. Defense counsel stated that appellant's mental illness was part of the defense because appellant's mother would

15

testify that appellant's family took his car away and she followed him out the door because of his mental illness. The trial court ruled that Dr. Markham could testify that appellant was suffering from mental illness and was delusional when he wrote and sent the letter to his neighbor and could also testify on certain other mental illness issues.

In his opening statement, the prosecution stated that there may be testimony that appellant had "some type of mental condition, which makes him not a violent person." He urged the jurors to listen to that evidence and all the evidence presented during the course of the trial. Defense counsel referred extensively to mental illness in her opening statement. She stated that appellant suffered from and struggled with bipolar disorder. She stated the evidence would show that the victims were aware appellant was mentally ill and that created an "environment of hostility and concern and fear" of what appellant might do to them. She stated the Kordics' account of the incident was fabricated based on their unreasonable fear of and prejudice against appellant because he was mentally ill.

In closing argument, the prosecution stated that the case was not about insanity. He acknowledged that evidence of mental illness was relevant to whether appellant had the specific intent required for the criminal threats in counts 2 and 4, but urged the jury to find appellant did intend the threats by focusing on the words appellant used. Defense counsel argued the case was "about prejudice towards the mentally ill." She argued the victims lied because "they wanted the crazy guy out of the neighborhood." She concluded her argument stating, "[T]his is weak evidence and our nation protects the innocent. Our nation protects the mentally ill[]. The mentally ill have rights."

At the hearing on appellant's motion for new trial, defense counsel argued that she did not voir dire the jury on issues of mental illness to determine if the jurors were prejudiced because the prosecution had agreed he would not bring up any evidence of mental illness. The prosecution stated that when the issue was first discussed he had questioned the circumstances under which the door would be opened to allow evidence of mental illness. He notified defense counsel on the day following voir dire that appellant's mental illness would be mentioned in the 9-1-1 calls and was relevant to whether the victims were in fear. Counsel requested and was given permission to call

16

Dr. Markham to testify. The trial court inquired if counsel believed the verdict would have been different had the jurors been asked about their feelings on mental health. Defense counsel stated her belief that evidence of mental illness had a strong impact on the jurors' opinion of appellant because he did not testify. The prosecution stated that mental health was sufficiently presented by counsel through Dr. Markham's testimony, and the ultimate question was whether the jurors could be fair and impartial, and all of them confirmed during voir dire that they would be. The trial court denied appellant's motion for new trial.

### E. Analysis

Appellant's contention that there was prosecutorial misconduct is predicated on the assumption that there was an agreement by the prosecution that he would exclude or not bring up any evidence of mental illness. An examination of the record shows there was no such agreement.

At the hearing on the prosecution's pretrial motion to limit defense psychiatric evidence, defense counsel indicated that it was not presenting a mental illness defense and did not intend to have Dr. Markham testify. The prosecution stated that under those circumstances there was no issue remaining with respect to the motion. The prosecution did not enter into any agreement that he would not bring up any evidence of mental illness as the motion and hearing at that point concerned Dr. Markham's testimony only. The prosecution asked for clarification of defense counsel's remark that Dr. Markham might testify if the door was opened through other witnesses. The prosecution specifically asked about a situation where a witness was afraid of appellant because they believed he was mentally ill. The prosecution's concern was not directly addressed. The trial court and both parties then engaged in a discussion concerning the admissibility of portions of a letter appellant wrote and sent to a neighbor. When defense counsel again reiterated that the defense did not intend to present evidence of mental illness, the court stated, "At this time any evidence of [mental illness] is excluded." The prosecution did not enter into any agreement at this time to exclude evidence of mental illness and noted there was evidence that appellant's mother spoke to the victims, apologized for

17

appellant's behavior and explained that appellant had mental issues. When the court instructed both sides at defense counsel's request to tell their witnesses not to go into the area of mental illness, the prosecution again made it clear that the issue may have to be revisited depending on how the testimony developed at trial.

Appellant repeatedly refers to an agreement[2] by the prosecution to exclude evidence of mental illness without any support in the record. It is clear from the transcript of the discussions that the prosecution had concerns regarding the court's instruction on mental illness. It is not plausible that the prosecution would have entered into an agreement to exclude all evidence of mental illness prior to jury voir dire when he had raised the issue with the court moments earlier and it had not been addressed to his satisfaction. The prosecution did not attempt to deceive defense counsel regarding evidence of mental illness and sought no restriction on defense counsel's right to voir dire the jury on that issue. Likewise, the trial court placed no restriction on the parties' voir dire on mental illness. Because there was no agreement to exclude evidence of mental illness, there could be no breach of that agreement by the prosecution, and therefore no prosecutorial misconduct.

Appellant's ineffective assistance of counsel claim also fails because he cannot demonstrate it is reasonably probable he would have obtained a better result at trial if his counsel had questioned the prospective jurors about mental illness. To prevail on an ineffective assistance of counsel claim, the appellant must establish two things: (1) counsel's performance fell below an objective standard of reasonableness, and (2) prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Hernandez* (2012) 53 Cal.4th 1095, 1105.) The *Strickland* court explained prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington, supra,* at

---

[2]     In appellant's motion for new trial, appellant refers to the "prosecutor's stipulation" to exclude evidence of mental illness prior to jury selection.

18

p. 694.) Further, the high court stated a reasonable probability is "a probability sufficient to undermine confidence in the outcome" of the proceeding. (*Ibid.*)

First, appellant's counsel was aware that mental illness was an issue in this case because she retained a psychiatric defense expert. In opening statement she indicated that appellant suffered from and struggled with a longstanding mental illness. She presented extensive evidence of appellant's mental illness through Dr. Markham. A central theme of her closing argument was that the case was about prejudice towards the mentally ill, and the victims in this case had an unreasonable fear of, and were prejudiced against appellant for being mentally ill. Counsel could reasonably have concluded that it was not necessary to question the prospective jurors about mental illness. (*People v. Jones* (2003) 29 Cal.4th 1229, 1254 [""'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel"'"].)

Second, appellant has not established a "'reasonable probability that, but for counsel's [decision] the result of the proceeding would have been different.' [Citation.]" (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1122, fn. omitted.) Each of the jurors was asked whether they could be fair and impartial and all of the jurors confirmed that they would be. The trial court admonished the jurors not to let bias, prejudice, or public opinion influence their decision, and that bias included bias for or against appellant based on disability. We presume the jurors followed the trial court's instructions. (See *People v. Frank* (1990) 51 Cal.3d 718, 728 ["the general rule is that on appeal we must assume the jury followed the court's instructions and admonitions"].) The question to be determined was whether appellant committed the charged acts and the case came down to a credibility contest between the victims and Mrs. MacKenzie. The victims testified they were threatened and assaulted by appellant. Mrs. MacKenzie testified she followed closely behind appellant's truck and appellant neither stopped at the Kordic residence nor drove the truck at Mrs. Hatefi. The jury rejected appellant's version of events presented by his mother. There was no evidence that any juror harbored a bias against the mentally ill and appellant fails to show how a different outcome would have resulted had the jurors been questioned on that subject.

19

Appellant also suggests his counsel was ineffective because she failed to move for a mistrial on the grounds of prosecutorial misconduct when the prosecution breached his agreement to exclude evidence of mental illness. As explained above, there was no agreement and counsel could thus reasonably conclude that a motion for mistrial on that ground was not warranted or likely to succeed.

Appellant counsel's tactical decisions do not constitute deficient performance and appellant has failed to show that counsel provided ineffective assistance.

## II. The Trial Court Did Not Err, Prejudicially or Otherwise, in Permitting the Prosecution to Present Rebuttal Evidence and Precluding the Defense from Presenting Surrebuttal Evidence

Appellant contends the trial court erred by allowing testimony by Mrs. Kordic to rebut testimony by Mrs. MacKenzie. Appellant further contends the trial court erred in preventing defense counsel from presenting evidence in surrebuttal.

### A. *Background*

During the prosecution's case-in-chief, Mrs. Kordic testified that on the day of the incident Mrs. MacKenzie stopped in front of the Kordics' house and spoke with her before driving away in the same direction as appellant. Mrs. MacKenzie testified during the defense case that she did not stop and have a conversation with Mrs. Kordic on June 6, 2010, and did not tell her that appellant had mental illness problems. After the defense rested, the prosecution indicated he would call Mrs. Kordic to rebut Mrs. MacKenzie's testimony. Appellant's counsel objected on the grounds the testimony was "[c]umulative and redundant" because Mrs. Kordic had "already testified to that." The court ruled the testimony would be allowed, but each party would have five minutes to conduct its examination. Mrs. Kordic testified about the substance of two conversations with Mrs. MacKenzie. The first occurred on June 6, 2010, shortly after appellant drove away. She testified that Mrs. MacKenzie apologized for appellant's behavior and said he suffered from mental illness since 2002. The second conversation occurred a few weeks later and Mrs. Kordic testified that Mrs. MacKenzie accused Mr. Kordic of "mad dogging" appellant and his brother. Appellant's counsel indicated

20

the defense had a rebuttal witness based on Mrs. Kordic's testimony. The trial court denied appellant counsel's request and stated, "There's no rebuttal to the rebuttal. So we are done." A discussion took place regarding jury instructions and after a brief recess the jury was instructed and closing arguments were presented.

**B.     Applicable Law**

The trial court has broad discretion to limit the scope of evidence offered in rebuttal to prevent unnecessary repetition of matters that should have been sufficiently covered in the original case. (§ 1093, subd. (d); see also § 1044 [authorizing trial court to "control all proceedings" and "to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved"]; see also *People v. Lamb* (2006) 136 Cal.App.4th 575, 582 ["trial judge may limit scope of surrebuttal evidence to prevent repetition of matter that should have been covered in the original case or to prevent unfairness to the other party"].) The decision whether to admit on rebuttal testimony that could have been presented in the party's case-in-chief is reviewed for abuse of discretion. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1232; see generally *People v. Alvarez* (1996) 14 Cal.4th 155, 201 [trial court's discretion in admitting or excluding evidence is reviewable for abuse and will not be disturbed on appeal except upon a showing that decision was arbitrary, capricious or patently absurd and resulted in manifest miscarriage of justice].) The trial court has no discretion to admit irrelevant evidence. (Evid. Code, § 350; *People v. Derello* (1989) 211 Cal.App.3d 414, 425–426.)

**C.     Analysis**

To determine whether there was an abuse of discretion, we address two factors: (1) whether Mrs. Kordic's testimony that Mrs. MacKenzie did stop and tell her that appellant had mental illness problems satisfied the "relevancy" requirement set forth in

21

Evidence Code section 210,[3] and (2) if the evidence was relevant, whether the trial court abused its discretion under Evidence Code section 352[4] in finding that the probative value of the testimony outweighed its prejudicial effect. (*People v. Heard* (2003) 31 Cal.4th 946, 972.)

We find no abuse of discretion in the trial court's decision to permit Mrs. Kordic's testimony because it was relevant to witness credibility issues. (Evid. Code, §§ 210, 350.) Mrs. MacKenzie testified that she followed inches behind the truck appellant was driving, that she did not stop and talk to Mrs. Kordic, and she did not tell Mrs. Kordic that appellant had mental illness problems. Mrs. Kordic's testimony was relevant to the jury's evaluation of which witnesses were lying and which were telling the truth. The testimony was also relevant to the jury's determination of whose account of the incident was credible which was probative of the ultimate question of appellant's guilt.

Mrs. Kordic's rebuttal testimony was not cumulative because she did not testify to the substance of the conversations in the prosecution's case-in-chief. The considerable probative value of the evidence outweighed any minimal undue prejudice related to appellant's mental illness because the jury had heard extensive evidence about appellant's mental illness during the defense case. The trial court's decision to permit the rebuttal testimony was not arbitrary, capricious or patently absurd, nor did it result in a miscarriage of justice.

Appellant contends the trial court's authority to prevent repetition of matters that should have been presented in the case-in-chief should apply to rebuttal evidence only, and not surrebuttal. The trial court's decision to exclude appellant's surrebuttal evidence

---

[3]    Evidence Code section 210 provides in pertinent part: "'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

[4]    Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

in this case was not an abuse of discretion. The court was concerned about repetition of matter already presented and the undue consumption of time it would necessitate. Although appellant's counsel did not identify the surrebuttal witness it intended to call, the circumstances of the conversation indicate that appellant's counsel would have called Mrs. MacKenzie, who had already testified to her account. Any such additional testimony necessarily "would have been repetitive and time consuming in an already lengthy and, at times, tedious trial." (*People v. Lamb, supra,* 136 Cal.App.4th at p. 582.)

We also reject appellant's related contention that the exclusion of his surrebuttal evidence deprived him of his constitutional right to present a defense. (See *People v. Boyette* (2002) 29 Cal.4th 381, 427–428 ["'[a]s a general matter, the [proper] "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense"'"].)

## III. Trial Court Had No Duty to Give Unanimity Jury Instruction

Appellant contends that the trial court erred in failing to instruct the jury sua sponte with the unanimity instruction on counts 2 and 4, to ensure that all the jurors agreed on the specific threats that constituted the offenses because there were a number of acts alleged by the prosecution from which the jury could have found that appellant was guilty of criminal threats. Specifically appellant contends some of the jurors may have believed that appellant committed the offenses of criminal threats by threatening the Kordics from inside his parents' house, whereas other jurors may have believed the threats occurred when he stopped the truck in front of the Kordics' house.

"When an accusatory pleading charges the defendant with a single criminal act, and the evidence presented at trial tends to show more than one such unlawful act, either the prosecution must elect the specific act relied upon to prove the charge to the jury, or the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.)

"The unanimity requirement is constitutionally rooted in the principle that a criminal defendant is entitled to a verdict in which all 12 jurors concur, beyond a

23

reasonable doubt, as to each count charged." (*People v. Brown* (1996) 42 Cal.App.4th 1493, 1499–1500; see Cal. Const., art. I, § 16.) Even when the defendant does not request a unanimity instruction, "such an instruction must be given sua sponte where the evidence adduced at trial shows more than one act was committed which could constitute the charged offense, and the prosecution has not relied on any single such act." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 274–275.)

This was not a case in which the prosecution asked the jurors to select from among several discrete acts by appellant in order to convict him on counts 2 and 4. Contrary to appellant's contention, the record shows that the prosecution made the required election and clearly informed the jury in opening and closing argument that he was relying on the threat appellant made when he stopped the truck in front of the Kordic house, looked at Mr. Kordic, and said he was going to kill the whole Kordic family and slash their throats. The prosecution began his closing argument by explaining that appellant committed the charged criminal threats when he "drove his truck across the street, yelled out the window that he was going to kill Monica and Pete Kordic by slicing their throats and their family's throats." The prosecution concluded his closing argument by stating that appellant "threatened to kill Monica and Pete Kordic on June 6 of last year; and that after that, he drove off and he drove his car at Mrs. Hatefi."

The threats shouted from inside appellant's parents' house were never definitively attributed to appellant and the prosecution stated in opening argument that the Kordics were not frightened at that point. The prosecution argued that the element of reasonable sustained fear necessary for the charged crimes of criminal threats arose when appellant drove across the street and yelled that he was going to kill the Kordics and slash their throats.

Because the prosecution communicated to the jury the pertinent threat it was relying on to prove counts 2 and 4, a unanimity instruction was not required and the court had no sua sponte duty to so instruct.

**IV. No Error in Limitation of Closing Argument**

Appellant contends the trial court abused its discretion by imposing a time limit on the defense's closing argument and in so doing violated his constitutional right to due process. Appellant also contends the trial court gave the jury the impression that defense counsel's argument was not important by announcing when five minutes and one minute remained. Appellant's claim fails because the trial court's limitation was reasonable under the circumstances.

On September 14, 2011, during the presentation of the defense case, the trial court admonished Mr. Hatefi to answer the questions asked of him without unnecessary elaboration. Before recommencing testimony the court held an in-chambers conference with counsel. The court was concerned because the case was "dragging on" and told counsel to be more precise with their questions and move on. The court stated that it was "not going to have a lot of leeway with either side anymore" and stated its intention to impose time limits. Before trial recommenced the following day, the court informed counsel that the trial was to be completed that day. A discussion took place regarding jury instructions and time estimates were given for the upcoming testimony from Dr. Markham and the rebuttal witness. The court informed the parties that they would have whatever time remained after the jury was instructed for closing arguments.

Just before it read the instructions to the jury, the court commented, "This trial will be over today so whatever time is left after the instructions we will have closing arguments." Prior to the prosecution commencing his closing argument the court advised him that he had a total of 17 minutes to be used for closing and rebuttal arguments. The prosecution asked the court to advise him before he completed ten minutes of his allotted time. The prosecution presented his closing argument and appellant's counsel followed. During appellant counsel's closing argument the court advised her when she had five minutes left, and again when she had one minute left. The prosecution then presented his rebuttal argument.

Appellant raised this issue in a motion for new trial, which the trial court denied. Appellant complained that she did not have sufficient time to present closing argument.

25

Specifically she argued that she did not have the opportunity to address the elements of the offenses or the impact of the mental illness evidence and Deputy Huerta's testimony. The prosecution stated the issues of the case were not complicated and the amount of time allocated by the court was adequate to review the evidence and present argument. The court noted that the jury knew the elements of the offenses because it was part of the jury instructions which were not complicated. The court explained that it did not arbitrarily set a time limit on closing arguments but did so to ensure the trial could be completed that day. The court noted that it had allowed counsel to examine the witnesses at length to establish all of the facts and that he had advised the parties of his intent to limit arguments.

"It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (§ 1044.) Although a criminal defendant has a constitutional right to have counsel present closing argument to the trier of fact, section 1044 gives the trial court discretion to set reasonable time limits on such argument. (*People v. Benavides* (2005) 35 Cal.4th 69, 110.) We uphold a trial court's determinations under section 1044 unless the court patently abused its discretion. (*People v. Calderon* (1994) 9 Cal.4th 69, 79.)

The record indicates the trial court acted within its broad discretion in setting a reasonable time limit for the parties' closing arguments. The evidence was not lengthy or complicated, nor were the jury instructions. (See *People v. Mendosa* (1918) 178 Cal. 509, 510 ["'there was no error committed in limiting defendant's argument to fifteen minutes in view of the small number of witnesses examined and the brevity of their testimony'"].) The parties were made aware of the court's frustration with the pace of the trial and had been informed on the day prior to closing arguments that the court intended to impose time limits. Furthermore the court did not arbitrarily pick a time limit but

informed the parties that the time remaining after the jury had been instructed would be divided equally[5] between counsel to ensure the trial concluded on that same day.

Reminding a lawyer of his time limit is a common function of the trial court within its power to manage the trial. (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 289–290 [reminding and encouraging the trial court to use its inherent power to exercise control over all proceedings connected with the litigation before it].) We see no evidence the jury got the impression that the trial court minimized the importance of defense counsel's argument. The trial court's reminders of the time remaining were done for appellant counsel's benefit so that she could focus her argument on the issues that were important. Likewise, appellant's claim that the time limits imposed on his closing argument infringed upon his federal and state constitutional rights to due process, counsel, and a fair trial fail because, as we have concluded, the court did not err. (*People v. Benavides, supra,* 35 Cal.4th at p. 111.)

Finally, appellant's ineffective assistance of counsel claim based on his trial counsel's failure to object to the amount of time given to her for closing argument, and failure to argue for more time, fails. In light of the court's strong admonitions to counsel regarding the pace of the trial, any objections by appellant's trial counsel would have been overruled by the trial court. Furthermore, a review of the defense closing argument indicates counsel addressed the jury instructions, the elements of the offenses, Deputy Huerta's testimony, and mental illness. There is no reason to believe any longer argument would have done anything to change the jury's verdicts. Appellant has failed to show a reasonable probability that, but for trial counsel's lack of objection or request for more time, appellant would have obtained a more favorable result. (*People v. Blankenship* (1959) 171 Cal.App.2d 66, 82.)

---

[5] The prosecution's closing argument and rebuttal was contained in approximately 11 pages of reporter's transcript; defense counsel's argument was contained in approximately 14 pages.

**V.     Substantial Evidence Supports Appellant's Convictions on Counts 1, 3, and 4**

Appellant contends the evidence was insufficient to sustain the convictions.  We disagree.

When an appellant challenges the sufficiency of the evidence to support a conviction, "we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  We "'"presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."'" (*People v. Davis* (1995) 10 Cal.4th 463, 509.)  We draw all reasonable inferences in support of the judgment. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1237.)  "An inference is not reasonable if it is based only on speculation." (*People v. Holt* (1997) 15 Cal.4th 619, 669.)

The same standard applies when the conviction rests primarily on circumstantial evidence. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.)  Evidence of a defendant's state of mind is almost inevitable circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction. (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)  A jury may infer a defendant's mental state from all of the facts and circumstances shown by the evidence, including the circumstances attending the act, the manner in which it is done, and the means used, among other factors. (§ 21, subd. (a); *People v. Lindberg* (2008) 45 Cal.4th 1, 27.)  If the evidence justifies a reasonable inference that the requisite state of mind existed, the verdict may not be disturbed on appeal. (*People v. Holt, supra,* 15 Cal.4th at p. 670.)  Applying this standard, appellant's arguments fail to persuade us that reversal of the convictions is warranted.

### A.     *Count 1–Assault with a Deadly Weapon Against Mrs. Hatefi*

#### 1.     Relevant Authority

Section 245, subdivision (a)(1) punishes assaults committed "with a deadly weapon or instrument other than a firearm."[6]  Whether or not the victim is injured is immaterial because the statute focuses on use of a deadly weapon or instrument or, alternatively, on force likely to produce great bodily injury.  (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.)  A deadly weapon within the meaning of section 245, subdivision (a)(1) is "'*any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.*'" (*Aguilar, supra,* at pp. 1028–1029, 1037.)

An assault occurs whenever the defendant's act "by its nature will probably and directly result in injury to another, i.e., a battery. . . .  Because the offensive or dangerous character of the defendant's conduct, by virtue of its nature, contemplates such injury, a general criminal intent to commit the act suffices to establish the requisite mental state." (*People v. Colantuono* (1994) 7 Cal.4th 206, 214–215; see also *People v. Williams* (2001) 26 Cal.4th 779, 790.)

#### 2.     Analysis

Appellant contends the evidence was insufficient to prove the element of general intent.  He argues that his conduct was at worse "mere recklessness" and no motive was shown for appellant to run over Mrs. Hatefi.  The People were not required to prove a motive.  The People established that appellant "willfully committed an act that by its nature will probably and directly result in injury to another" (*People v. Colantuono, supra,* 7 Cal.4th at p. 214), with "actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical

---

[6]     "(a)(1) Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment."  (§ 245, subd. (a)(1).)

force against another" (*People v. Williams, supra,* 26 Cal.4th at p. 790). The evidence met those requirements. It showed that appellant drove his truck across to the opposite side of the street where Mrs. Hatefi was walking. Mrs. Hatefi saw appellant steer the truck with his right hand and extend his left arm out the window with his middle finger extended. The truck came close enough to Mrs. Hatefi that she was forced to jump out of its way. Mrs. Kordic testified the truck came within two feet of Mrs. Hatefi. Appellant has not established that a rational trier of fact could not have found him guilty of assault with a vehicle based on the foregoing evidence.

### B.     Count 3–Failure to Care for an Animal

#### 1.     Relevant Authority

Section 597f provides in pertinent part: "(a) Every owner, driver, or possessor of any animal, who permits the animal to be in any building, enclosure, lane, street, square, or lot, or any city, city and county, or judicial district, without proper care and attention, shall, on conviction, be deemed guilty of a misdemeanor." A conviction under section 597f requires proof of criminal negligence. (*People v. Speegle* (1997) 53 Cal.App.4th 1405, 1415.) "'[A]n act is criminally negligent when a man of ordinary prudence would foresee that the act would cause a high degree of risk of death or great bodily harm.'" (*People v. Villalobos* (1962) 208 Cal.App.2d 321, 327.)

#### 2.     Analysis

The evidence showed that appellant returned to the neighborhood accompanied by his unleashed dog after the sheriff's deputies had responded to the 9-1-1 calls from Mrs. Kordic and Mr. Hatefi. Appellant continued walking down the street after Deputy Moultrie called out to him and ordered him to stop. Appellant looked in Deputy Moultrie's direction but continued walking. Deputy Moultrie approached appellant and in a louder tone of voice again ordered him to stop. As appellant turned to face Deputy Moultrie his large "shepherd-type" dog barked, growled, and displayed his teeth in a vicious manner towards Deputy Moultrie. Deputy Moultrie feared for his safety. He drew his weapon and ordered appellant to secure the dog. Appellant did not secure the

dog and told Deputy Moultrie to "go ahead and shoot the dog." The dog continued to bar, growl, and "display[] a vicious face, teeth and all."

Appellant cites to a number of cases that have dealt directly with section 597f and argues that they involved severe neglect resulting in harm. Appellant argues that since his dog was not injured as a result of his failure to secure it, he did not violate the statute. Appellant is mistaken. The evidence showed that appellant did not display the "proper care and attention" necessary to prevent foreseeable harm to his dog. Appellant's family members had to come outside and secure the dog.

We do not agree with appellant's contention that it is "absurd" to conclude that there was "a high risk that a peace officer would have shot a family dog, a pet, in front of the family's home, in the middle of the afternoon, in the presence of several neighbors, if the dog continued to bark and growl and bare its teeth at the officer . . . ." The jury could reasonably find that appellant permitted his dog to be on the street without proper care and attention, and that his act of refusing to secure the dog while a police officer fearing for his safety pointed a loaded weapon at the dog caused a high degree of risk of death or great bodily harm to the dog.

### C. Count 4–Criminal Threat Against Mrs. Kordic

#### 1. Relevant Authority

Under section 422, the prosecution must prove "'(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat . . . was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' [Citations.]" (*In re George T.* (2004) 33 Cal.4th 620, 630.)

"'Section 422 [may be] violated . . . when such a threat is communicated by the threatener to a third party and by him conveyed to the victim . . . .' [Citation.]" (*People v. Felix* (2001) 92 Cal.App.4th 905, 911.) "Where the threat is conveyed through a third party intermediary, the specific intent element of the statute is implicated. Thus, if the threatener intended the threat to be taken seriously by the victim, he must necessarily have intended it to be conveyed." (*In re David L.* (1991) 234 Cal.App.3d 1655, 1659.)

## 2. Background

The evidence showed that on the night of June 5, 2010, appellant was on the street outside the Kordic residence taking photographs of Mr. Kordic's work van that had been vandalized. Camera flashes observed by the Kordics while they were talking to Deputy Huerta indicated that appellant was observing them from his house up the street. The following day both Mr. and Mrs. Kordic heard a male voice yelling that he was going to "kill them all." The voice came from appellant's house and was angry because someone had called the "fucking police" on him. Mrs. Kordic was "very concerned" that the threats were "geared and directed directly toward" her family because the Kordics had called the police the previous night. Shortly afterwards, Mrs. Kordic watched from her front porch as appellant approached Mr. Kordic who was in the Kordic's driveway. She saw appellant yell at her husband and make a motion with his hand across his throat. Mr. Kordic related to Mrs. Kordic that appellant said he was going to kill the entire Kordic family.

## 3. Analysis

Appellant contends the evidence was insufficient to prove that he intended that Mr. Kordic would convey to Mrs. Kordic his threat to kill the entire Kordic family. If the communication is with a third party as it was here, then it must be shown that appellant intended that the threat be conveyed to Mrs. Kordic. (*In re David L., supra,* 234 Cal.App.3d at p. 1659.) Such specific intent can be inferred from the circumstances. (*Ibid.*)

Here, Mrs. Kordic was watching from her front porch and a jury could infer that appellant saw Mrs. Kordic as he made the threat and intended that Mr. Kordic

32

communicate it to her. The circumstances and manner in which the threat was made also supports the inference that appellant intended that Mr. Kordic act as an intermediary to convey the threat to Mrs. Kordic. Appellant had been questioned the previous night by Deputy Huerta about the vandalism to Mr. Kordic's work van, and had seen Deputy Huerta talking to Mr. and Mrs. Kordic on the street outside their home. Moments before appellant stopped in front of the Kordic's house and threatened them, a voice from appellant's house was heard swearing loudly and complaining that someone had called the police on him.

Furthermore, in *In re David L.*, the defendant knew the third party would convey the threat to the victim because the victim and the third party were friends, and the prosecution proved the third party actually informed the victim of the defendant's remarks. (*In re David L., supra,* 234 Cal.App.3d at p. 1658.) Here, it can be inferred that appellant knew Mr. Kordic would convey the threat to Mrs. Kordic because she was his wife, and the prosecution here also proved through Mrs. Kordic's testimony that Mr. Kordic actually conveyed the threat to her.

There is no evidence to support appellant's contention that "the mention by appellant of Mr. Kordic's whole family was simply an attempt by appellant to deepen the effect of his statement on Mr. Kordic himself." The evidence shows that appellant's words and accompanying slashing of the throat motion were carefully chosen and intended to convey a specific threat. We may not reweigh the evidence nor reassess the credibility of the witnesses. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

## VI.    Appellant was Properly Convicted on Counts 2 and 4

Appellant contends that he could not lawfully be convicted of count 4 (criminal threat against Mrs. Kordic) in addition to count 2 (criminal threat against Mr. Kordic) because "[t]he mere fact that appellant . . . told Mr. Kordic that he was going to kill him and his whole family should not result in an additional charge and conviction . . . with Mrs. Kordic as a victim." Appellant contends "the judgment should be reversed as to count 4."

The evidence shows that appellant directly threatened Mr. Kordic (count 2) and the jury found him guilty. Appellant does not challenge the sufficiency of the evidence on that count. For the reasons stated in part V.C. above, we find substantial evidence supports the jury's verdict on count 4, i.e. that appellant intended his threat to be conveyed to Mrs. Kordic by Mr. Kordic. Therefore, his convictions of both counts 2 and 4 were proper.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J. *

FERNS

We concur:

_____, P. J.

BOREN

_____, J.

CHAVEZ

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.