Filed 7/2/14  P. v. Turner CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B247845 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA121958) |
| v. | |
| DION TURNER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kelvin D. Filer, Judge.  Affirmed.

John Doyle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Robert M. Snider, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Appellant Dion Turner appeals the judgment following his conviction of 11 counts based on a driveby shooting that wounded two victims and led to a police pursuit. He raises several different challenges, but we find none persuasive. We affirm.

## PROCEDURAL HISTORY

Following a driveby shooting that wounded victims Antion West and Grady Myers and led to a police pursuit, appellant was charged with 11 counts: (1) attempted willful, deliberate, and premeditated murder of West (Pen. Code, §§ 664/187, subd. (a)),[1] (2) attempted willful, deliberate, and premeditated murder of Myers (§§ 664/187, subd. (a)); (3) assault with a firearm against West (§ 245, subd. (a)(2)); (4) assault with a firearm against Myers (§ 245, subd. (a)(2)); (5) shooting at West from a motor vehicle (§ 26100, subd. (c)); (6) shooting at Myers from a motor vehicle (§ 26100, subd. (c)); (7) shooting at an inhabited dwelling house (§ 246); (8) possession of a firearm by a felon, with three prior felonies alleged (§ 29800, subd. (a)(1)); (9) possession of ammunition (§ 30305, subd. (a)(1)); (10) evading an officer with willful disregard of the safety of persons or property (Veh. Code, § 2800.2); and (11) possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a)).

The information also alleged an array of enhancements. For counts 3 and 4, it was alleged appellant personally used a firearm. (§ 12022.5.) For counts 3 through 6, it was alleged appellant personally inflicted great bodily injury. (§ 12022.7, subd. (a).) For counts 1, 2, 5, 6, and 7, it was alleged appellant personally and intentionally used and discharged a firearm causing great bodily injury. (§ 12022.53, subds. (b)-(d).) For counts 1 through 7, it was alleged appellant committed each offense for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subd. (b)(1)(C).) Likewise, for counts 8 through 11, it was alleged appellant committed each offense for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subd. (b)(1)(A).) Finally, for all counts, it was alleged appellant suffered two prior serious felony convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

2

(d)), and he did not remain free of custody for a period of five years after one of the prior serious felonies and two other convictions.

With one exception,[2] a jury found appellant guilty of all charges and found all allegations true. After a bench trial, the court found true that appellant had suffered two prior robbery convictions pursuant to the "Three Strikes Law," but exercised its discretion to strike one, and found true three convictions pursuant to section 667.5, subdivision (b). The court sentenced appellant to a total of 61 years in prison and imposed various fines, fees, and custody credits, the details of which are not pertinent to the current appeal. Appellant timely appealed.

## STATEMENT OF FACTS

Around 10:00 p.m. on February 2, 2012, uniformed Los Angeles Police Officers Salvador Torres and Kyle Korinek were leaving the Southeast Division police station near 108th and Spring Streets in Los Angeles in their patrol car when they heard two or three gunshots nearby. The shots were close enough that both officers jumped out of the car and took cover. Officer Torres looked in the direction of the shots and saw a car about 100 feet away stopped in the middle of 108th Street. He saw the driver, whom he identified at trial as appellant, fire six or seven more shots at two or three people standing outside a residence known as the "Big House." Among them were West, who was shot through the foot, and Myers, who was grazed in the buttocks.

Immediately after the shooting, appellant sped off through a residential area. Officers Torres and Korinek pursued and observed appellant speeding, running stop signs, driving on a sidewalk, and forcing another vehicle to slam on its brakes to avoid crashing into appellant's vehicle. Officer Torres counted at least seven moving violations. Two other police cars joined the pursuit. At one point, appellant drove in reverse toward Officers Torres and Korinek and they jumped out of the car with their weapons drawn. When appellant finally stopped his vehicle, he emerged from the

---

[2] After the prosecution rested, the trial court granted appellant's motion to dismiss the gang allegation in count 11. (§ 1118.1.)

3

driver's side door and fled on foot. Seconds later, Robert Smith, the passenger in appellant's car, emerged and fled. After a foot pursuit, Los Angeles Police Officer Derrick Ybarra, along with four other officers, apprehended appellant. Because appellant resisted, Officer Ybarra struck him once in his rib cage and twice on the left side of his face.

Without any grant of immunity or inducement, Smith testified that, before the shooting, appellant had pulled up to him outside the gas station where he lived (he was homeless), and he had gotten into appellant's car "to purchase . . . something." He observed appellant was upset and his face was swollen. Appellant told him he "got into it with his homeboys." Smith knew appellant was a member of the 11 Deuce Broadway Gangster Crips gang, who was known as "Yoball," and one of the "homeboys" in the altercation was "Noonie," also a member of the gang. Appellant told Smith, "I'm going to holler at them," and stopped his car near the Big House. Smith saw two people standing near the house and saw appellant reach over to get a gun, aim it, and start shooting. Smith said appellant had gloves on. Before taking off in the car, appellant threw the gun to Smith's side of the vehicle, telling Smith to "[f]ind the heater." When appellant fled, Smith could not exit because the doors were locked. Smith said to let him out, but appellant said, "I got this." Smith told appellant the police were pursuing them and he could hear the sirens. When appellant stopped the car, Smith ran, but he was arrested. He was never charged, although at the time of trial he was in custody for an unrelated conviction. At trial, he admitted he was addicted to cocaine and was under its influence on the night of the shooting. He also admitted he was a gang member when he was 21 years old. He had several prior convictions, including possession for sale and theft offenses. He testified he had a conversation with appellant after his arrest and appellant told him not to come to court and instead to "take the Fifth."

Myers testified that, following the shooting, he drove himself and West to the hospital about 20 minutes away. They were both treated. He did not receive any stitches and he saw West's foot was bandaged. He admitted both he and West were members of the 11 Deuce Broadway Gangster Crips gang; he goes by the name "Tall" and West goes

4

by the name "Noonie" or "Little Noonie." He had known appellant for around 20 years and denied he or West got into a fight with him on the day of the shooting. He did not know if appellant was a member of a gang, and he did not know why he or West had been shot at.

Officers recovered seven 9-millimeter bullet casings from the street where the shooting occurred. In the passenger seat of appellant's car, officers recovered an operable semiautomatic 9-millimeter handgun containing an empty ammunition magazine and two casings from the driver's floorboard. It was determined all the shell casings were fired through the handgun found in appellant's car. DNA analysis of the handgun and magazine did not reveal any DNA from either appellant or Smith, but that did not mean appellant did not handle the gun. Appellant's hands tested positive for gunshot powder residue.

While handcuffed to a bench in a holding cell, appellant reached into his pocket and later, where appellant's left foot had been, a sergeant recovered a small plastic bag containing usable rocks of cocaine base weighing 0.15 grams.

Officer Korinek testified he was familiar with the 11 Deuce Broadway Gangster Crips gang, which inhabits the area around the Los Angeles Police Department's Southeast Division. He was familiar with their gang signs and symbols, and he observed appellant had multiple tattoos associated with the gang. While booking appellant, Officer Korinek asked him whether he was affiliated with a gang. Appellant replied something like, "What do you think?" and shook his head, which Officer Korinek interpreted to mean, yes, he was a gang member.

At the time of trial, 24-year veteran Los Angeles Police Detective Peter Verschueren was assigned to the Southeast area gang impact team and had been for eight years. He had significant training on gangs and gathered information from contact with gang members. He explained the importance of respect in the gang setting, which can be earned by engaging in criminal activity such as narcotics sales, street robberies, shootings, witness intimidation, etc. Those activities show the member is willing to "put in work" for the gang. Gang members also seek to instill fear and intimidation in the

5

gang itself, in rival gangs, and in the community, which can make it less likely community members will report criminal activity. Within the gang, respect plays into the gang hierarchy because those members willing to "put in work" will move up in status. If a member is disrespected by a fellow member, a low-level member can be beaten, assaulted, shot, or even killed. If the disrespected member does not respond to the disrespect, he will be perceived as weak.

Detective Verschueren was tasked with obtaining information regarding the 11 Deuce Broadway Gangster Crips, among other gangs, and testified to the gang's signs and symbols. He identified the gang's primary activities as murder, attempted murder, assault with and without firearms, narcotics trafficking, weapons violations, graffiti, and witness intimidation. Two abstracts of judgment were admitted for convictions of gang members for assault with a deadly weapon, assault on a peace officer or firefighter, and narcotics sales.

Detective Verschueren opined that appellant was an 11 Deuce Broadway Gangster Crips gang member who goes by the name "Yo" or "Yoball." His opinion was based on appellant's gang tattoos and gang photographs and writings recovered from appellant's residence in 2011 that indicated appellant was still an active gang member. He also identified West as an 11 Deuce Broadway Gangster Crips gang member who goes by the name "Noonie." He stated gang members will have different roles in the gang, such as selling narcotics, or committing robberies, or committing shootings. Both West's and appellant's roles in the gang involved narcotics sales. He had arrested West once before for a narcotics violation and had been investigating him for narcotics trafficking.

When given a hypothetical situation mirroring the facts of the case, Detective Verschueren opined that the shooting was gang-motivated because both individuals were older gangsters and the individual who suffered the facial injury needed to restore his reputation within the gang. This played into the gang itself because if one member is seen as weak, the entire gang is presumed weak, so it was important to retaliate. The proximity of the shooting to a police station was also "extremely important" because it showed fellow members and the community how violent the gang was, creating an

6

atmosphere of fear and intimidation and fostering a reluctance to come forward to report crimes. The possession of a firearm and ammunition and evading officers benefitted the gang because it similarly intimidated the community, and successfully evading officers gave members opportunities to commit crimes in the future. The acts would also embolden other members to commit similar crimes. Simple possession of cocaine, under the circumstances, was not gang-related, however.

Appellant testified. He was 40 years old at the time of trial and he grew up in the 11 Deuce Broadway Gangster Crips territory, living there since 1985. He was known as "Yoball" and got gang tattoos when he joined the 11 Deuce Broadway Gangster Crips and started "gangbanging" in 1986. He met West in 1988 and Myers in 1991 or 1992, and they were his "homeboys." Appellant denied being a gang member at the time of trial or during the previous year. Since 2009, he and a friend operated a tattoo shop.

On the night of the shooting, appellant left his apartment bound for 108th Street and Broadway in his nephew's car. He was not under the influence of alcohol or drugs. Smith had been with him all day, and he denied picking Smith up, as Smith claimed. He also denied his face was swollen or he fought with West. He claimed an assault by a fellow gang member would never happen.

He drove to 108th Street and parked his car near the Big House. From about 30 feet away, he saw West and a few other people standing together in the driveway of the Big House, but he did not see Myers at first. He went into a friend's house nearby to get marijuana, and while inside, he heard around seven gunshots and dropped down. He exited and returned to his car without taking any marijuana.

Appellant knew the police station was close by, but Smith never alerted him to the presence of police officers. He denied leaving rapidly in his car, but he admitted he left the scene and the police pursued him for several blocks. He denied seeing their lights at first, but he heard the sirens and eventually saw the lights. When officers jumped out of their car during the pursuit, he decided to drive in reverse because he had just heard the shots nearby and did not want to get shot. He admitted driving on a sidewalk, running stop signs, and committing other moving violations without regard to the safety of others.

7

He eventually stopped his vehicle and fled on foot because he was scared. When he was caught and arrested, he was beaten up so that his eye was closed and his jaw was injured. He also suffered injuries to his knees, wrists, arm, and bicep. He was dragged to a police car and searched, but officers found no drugs on him.

He denied reaching for anything in his pockets while he was in custody and claimed he had nothing in his pocket that might have dropped to the floor. He denied the cocaine base recovered was his. He admitted being convicted of possessing a controlled substance in 2003.

He denied the firearm in his car was his and denied shooting at West and Myers. He believed Officer Torres planted the two bullet casings found in his car and he believed the gunshot residue test was positive because he was cross-contaminated by Officer Korinek, who picked up the casings in the street. He denied telling Smith to "plead the Fifth" instead of testifying. He went to the hospital a night or two after his arrest with a concussion and told physicians he had been assaulted by the police.

## DISCUSSION

### 1. *Sufficiency of the Evidence*

Appellant argues the evidence was insufficient to support the attempted murder counts, the gang enhancements, and the great bodily injury enhancements. We disagree.

### A. *Legal Standard*

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] 'This standard applies whether direct or circumstantial evidence is involved.'" (*People v.*

8

*Avila* (2009) 46 Cal.4th 680, 701 (*Avila*).) These standards also apply to our review of sentencing enhancements. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

B. *Premeditated Attempted Murder*

"To convict a defendant of first degree premeditated murder or attempted murder, the prosecution must establish 'beyond a reasonable doubt . . . that [the defendant] acted with the specific intent to kill, and with premeditation and deliberation.'" (*People v. Leon* (2010) 181 Cal.App.4th 452, 463.) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.'" (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).) "Express malice requires a showing that the assailant ""either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.'""" (*Ibid.*) "'[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may . . . be inferred from the defendant's acts and the circumstances of the crime.'" (*Avila, supra*, 46 Cal.4th at p. 701.)

When the charge is premeditated attempted murder, a finding of premeditation and deliberation is required. (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1223 (*Villegas*).) "The three categories of evidence for a reviewing court to consider with respect to premeditation and deliberation are: (1) prior planning activity; (2) motive; and (3) the manner of killing. 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ."'" (*Id.* at pp. 1223-1224, fn. omitted.)

The evidence amply supported the jury's conclusion that appellant intended to kill both West and Myers with premeditation and deliberation. With respect to West, both appellant and West sold narcotics for the 11 Deuce Broadway Gangster Crips and had just gotten into a fight. While in the car with appellant, Smith saw appellant's face was injured and he was upset, saying that he "got into it with his homeboys." Detective Verschueren testified this kind of fight is a sign of disrespect and appellant would have been viewed as weak if he had not responded, which provided a motive for appellant to

kill West. Appellant then drove to the Big House to "holler" at his "homeboys," bringing a loaded gun with him, which showed planning. (*Villegas, supra*, 92 Cal.App.4th at p. 1224 [carrying loaded gun is evidence of planning].) When appellant saw West, he aimed the gun and fired as many as nine shots at a fairly close range of 30 feet, which showed an intent to kill. (*Ibid.* [six shots from 25 feet demonstrated intent to kill].) It did not matter, as appellant contends, that the shots did not kill West and Myers because "the very act of firing a weapon '"in a manner that could have inflicted a mortal wound had the bullet been on target"' is sufficient to support an inference of intent to kill." (*Smith, supra*, 37 Cal.4th at p. 742.)

With respect to Myers, the evidence was sufficient to support a "kill zone" theory of attempted murder. "[A] shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm." (*Smith, supra*, 37 Cal.4th at pp. 745-746, citing *People v. Bland* (2002) 28 Cal.4th 313, 329-330.)[3] Based on the evidence recited above, the jury could have concluded appellant intended to kill everyone in his line of fire, including Myers, by creating a "kill zone" around West. (See *Bland, supra*, at pp. 330-331 [defendant shooting a "flurry of bullets" into a fleeing car primarily intending to kill one target "virtually compels" an inference of concurrent intent to kill the passengers based on a "kill zone" theory].)

C. *Gang Enhancements*

Appellant contends sufficient evidence did not support the "primary activities" requirement for the gang enhancements found true by the jury. "To trigger the gang

---

**3** The jury was instructed on this theory, although such an instruction was not required. (*Smith, supra*, 37 Cal.4th at p. 746.)

10

statute's sentence-enhancement provision (§ 186.22, subd. (b)), the trier of fact must find that one of the alleged criminal street gang's primary activities is the commission of one or more certain crimes listed in the gang statute." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 322 (*Sengpadychith*); see § 186.22, subd. (f).)  Section 186.22, subdivision (e) lists the crimes that qualify, including aggravated assaults, homicides, narcotics sales or transportation or manufacturing, shooting at an inhabited dwelling, shooting from a motor vehicle, witness or victim intimidation, felony vandalism, and carrying a loaded or concealed firearm.

The term "primary activities" "implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.]  That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*Sengpadychith, supra*, 26 Cal.4th at p. 323.) Sufficient proof of these "primary activities" may consist of "evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute," or testimony from a police gang expert, who bases his or her opinion on conversations with gang members, personal investigations of crimes committed by gang members, and information from law enforcement colleagues. (*Id.* at p. 324.)  We may consider both past and currently charged offenses as part of the gang's "primary activities." (*Id.* at p. 323.)

There was ample evidence to satisfy the "primary activities" element of the gang enhancements.  Detective Verschueren was a highly trained gang expert with eight years' field experience who had been assigned to investigate the 11 Deuce Broadway Gangster Crips.  He testified the primary activities of the gang are murder, attempted murder, assault with and without firearms, narcotics trafficking, weapons violations, graffiti, and witness intimidation.  Two abstracts of judgment were admitted showing convictions of 11 Deuce Broadway Gangster Crips gang members for assault with a deadly weapon, assault on a peace officer or firefighter, and narcotics sales.  Detective Verschueren had also arrested West, a gang member, for narcotics sales.  The jury was also permitted to consider appellant's current attempted murder and other offenses, which were committed

11

in order to restore appellant's and his gang's reputation in the area following the fight with West. (*Sengpadychith, supra*, 26 Cal.4th at p. 323.) This evidence was more than sufficient to satisfy the "primary activities" requirement for the gang enhancements.

## D. *Great Bodily Injury Enhancements*

Appellant contends sufficient evidence did not support the great bodily injury enhancements for counts 3 through 7 pursuant to sections 12022.53, subdivision (d) and 12022.7, subdivision (a). Section 12022.7, subdivision (a) provides, "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." Section 12022.53, subdivision (d) provides that 25 years is added to a sentence if the defendant inflicted great bodily injury by personally and intentionally discharging a firearm. "Great bodily injury" is defined as "a significant or substantial physical injury" (§ 12022.7, subd. (f)), which requires "substantial injury *beyond* that inherent in the offense," but not "'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function" (*People v. Escobar* (1992) 3 Cal.4th 740, 746, 750). This is an issue of fact and we must accept the jury's finding even if the circumstances might reasonably be reconciled with a contrary finding. (*Id.* at p. 750.)

Sufficient evidence supported the jury's finding West and Myers suffered great bodily injury. West had been shot through the foot and Myers grazed on his buttocks. Myers drove them to the hospital where they received medical care. According to Myers's medical records received in evidence, he felt a "burning" sensation. His wound was dressed and he was supposed to follow up with his doctor in two days. West's medical records noted his wound caused him "severe, constant, sharp, localized pain," he was unable to bear weight on his foot, and he was given crutches. He was also supposed to follow up with his doctor in two days. Although Myers did not receive any stitches and West's foot was only bandaged, the injuries were not so minor that the jury could not have found they constituted great bodily injury. Courts have found great bodily injury under similar facts. (See *People v. Wolcott* (1983) 34 Cal.3d 92, 107 [great bodily injury

12

from bullet wound that left fragments in victim, but caused little blood loss or pain, did not require sutures, and caused no permanent disability; victim was released after treatment and went to work the next day]; *People v. Mendias* (1993) 17 Cal.App.4th 195, 201, 206 [great bodily injury from bullet wound requiring hospital treatment, even though victim was discharged the next day; bullet was not removed but caused no pain]; *People v. Lopez* (1986) 176 Cal.App.3d 460, 463-465 & fn. 5 [great bodily injury from gunshot wound to one victim near buttock and gunshot wound to another victim through thigh, even absent evidence victims sought or received medical treatment].)

## 2. *Bifurcation of Gang Allegations and Restriction on Gang Expert's Testimony on Primary Activities; Ineffective Assistance of Counsel*

Appellant contends his due process and fair trial rights were violated when the trial court failed to either bifurcate the gang allegations from the trial on the main charges or prevent Detective Verschueren from testifying that two of the gang's primary activities are murder and attempted murder. He forfeited both issues by not raising them in the trial court. (*People v. Maciel* (2013) 57 Cal.4th 482, 531 [objections to evidence not made in trial court are forfeited]; cf. *People v. Maury* (2003) 30 Cal.4th 342, 391 [severance issue forfeited by failing to raise it in trial court].) Recognizing the forfeiture issue, appellant contends his counsel was ineffective for failing to raise these issues in the trial court. "'To establish ineffective assistance, defendant bears the burden of showing, first, that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms. Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to him.'" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1052-1053 (*Hernandez*).)

A trial court has broad discretion to bifurcate the trial of a gang enhancement from the main trial, but bifurcation is usually unwarranted when the evidence of gang membership is relevant to the charged offenses. (*Hernandez, supra*, 33 Cal.4th at pp. 1048-1049.) "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal

13

enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Id.* at p. 1049.) Bifurcation was not required here because the gang evidence in this case was directly relevant to appellant's motive and intent. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167.) This case involved a long-time gang member who shot at two other long-time gang members following a fight with one of them. According to Detective Verschueren, the fight disrespected appellant and had he not responded, he would have been viewed as weak. Further, any potential unfair prejudice was minimized by the trial court's instruction limiting the jury's consideration of gang evidence to intent and motive, among other defined purposes, and preventing the jury from "conclud[ing] from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." (*Ibid.* [approving identical instruction].) We presume the jury followed this instruction. (*People v. Frank* (1990) 51 Cal.3d 718, 728.) Thus, appellant can show neither deficient performance nor prejudice from his counsel's failure to request bifurcation.

We reach the same conclusion for Detective Verschueren's testimony that the gang's primary activities include murder and attempted murder. This testimony was highly probative of appellant's intent and motive in the shooting at issue. While this testimony was certainly negative for appellant, not all damaging evidence is prejudicial in the sense of evoking an emotional bias, which had little effect on the issues. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214.) Appellant can show neither deficient performance nor prejudice from his counsel's failure to object to Detective Verschueren's testimony on the gang's primary activities.

### 3. *Ineffective Assistance of Counsel in* Pitchess *Motion*

Appellant contends his counsel was ineffective in a pretrial motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) because counsel failed to present a plausible basis to discover complaints against the officers involved in his pursuit and arrest. Discovery pursuant to *Pitchess* is "a two-step process. First, defendant must file a motion supported by declarations showing good cause for discovery

14

and materiality to the pending case. . . . Once the defense has established good cause, the court is required to conduct an in camera review of the records to determine what, if any, information should be disclosed to the defense." (*People v. Samuels* (2005) 36 Cal.4th 96, 109, citations omitted.) The "good cause" requirement in the first step requires a showing of a "plausible scenario of officer misconduct," which is "one that might or could have occurred. Such a scenario is plausible because it presents an assertion of specific police misconduct that is both internally consistent and supports the defense proposed to the charges. A defendant must also show how the information sought could lead to or be evidence potentially admissible at trial." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1026 (*Warrick*).)

We agree with appellant that defense counsel failed to articulate a "plausible scenario of officer misconduct" in order to obtain *Pitchess* in camera review. (*Warrick v. Superior Court, supra*, 35 Cal.4th at p. 1026.) In the *Pitchess* motion, defense counsel sought complaints of dishonesty against eight officers involved in appellant's pursuit and arrest. Among other documents, counsel submitted police reports and his own declaration, which briefly set forth the version of events in the police reports and stated appellant "denies these allegations, as well as the arresting officers' depiction of what happened prior to and during the arrest." Counsel also claimed the officers fabricated appellant's identity and the arrest report "contains material fabrications and omissions made by officers in preparing the report, or by officers supplying that information." These blanket statements were the entire basis for the motion and nowhere did defense counsel articulate any detail whatsoever about what information was false or which of the eight officers falsified it. Based on these vague claims, the trial court properly denied the motion. (See *Warrick, supra*, 35 Cal.4th at p. 1025 ["What the defendant must present is a specific factual scenario of officer misconduct that is plausible when read in light of the pertinent documents."].)

Although counsel was deficient, appellant has not shown prejudice. For seven of the officers subject to the *Pitchess* motion, appellant has pointed to no information that counsel might have added to the motion that would have led to discoverable information

15

capable of changing the outcome of the trial. For the eighth officer, Officer Ybarra, appellant points out that Officer Ybarra's police report indicated appellant had "several pre-existing injuries to his face" including "a bruised and swollen right eye and swollen left cheek," whereas appellant denied getting into a fight with West and instead claimed he suffered the alleged "pre-existing injuries" during his arrest. Even if that specific factual scenario justified in camera review leading to information discounting Officer Ybarra's credibility, the evidence at trial still would have overwhelmingly demonstrated appellant's guilt. Without any inducement, Smith independently testified appellant's face was injured and he was upset, saying he "got into it with his homeboys." Appellant then drove to the Big House and brought a loaded gun, which he aimed and fired at fairly close range when he saw West. He then led officers on a high-speed chase through a residential neighborhood. The casings found at the scene and in appellant's car matched appellant's gun, and appellant had gunshot residue on his hands. In light of this evidence, any information undermining Officer Ybarra's credibility would not have changed the outcome of the trial, so appellant suffered no prejudice from counsel's deficiencies related to the *Pitchess* motion.

## DISPOSITION

The judgment is affirmed.

FLIER, J.

WE CONCUR:

RUBIN, ACTING P. J.

GRIMES, J.

16